## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Ahmed Shqeirat, Mohamed Ibrahim,
Didmar Faja, Omar Shahin, Mahmoud
Sulaiman, and Marwan Sadeddin,

        Plaintiffs,

    v.

U.S. Airways Group, Inc.,
U.S. Airways, Inc., and
Metropolitan Airports Commission,

        Defendants.

**MEMORANDUM OPINION
AND ORDER**
Civ. No. 07-1513 ADM/AJB

_____

Omar T. Mohammedi, Esq., Law Firm of Omar T. Mohammedi, LLC, New York, NY, and
Frederick J. Goetz, Esq., Goetz & Eckland P.A., Minneapolis, MN, argued on behalf of
Plaintiffs.

Dane B. Jaques, Esq., Dombroff Gilmore Jaques & French, P.C., McLean, VA, and Michael C.
Lindberg, Esq., Johnson & Lindberg, P.A., Minneapolis, MN, argued on behalf of U.S. Airways
Group, Inc., and U.S. Airways, Inc.

Timothy R. Schupp, Esq., Flynn, Gaskins & Bennett, L.L.P., Minneapolis, MN, argued on behalf
of the Metropolitan Airports Commission.

_____

## I. INTRODUCTION

On August 21, 2007, the undersigned United States District Judge heard oral argument

on Defendants U.S. Airways Group, Inc. and U.S. Airways, Inc.'s (collectively "U.S. Airways")

Motion to Dismiss [Docket No. 13] and Motion for Summary Judgment [Docket No. 9],

Defendant Metropolitan Airport Commission's ("MAC") Motion to Dismiss [Docket No. 6], and

Plaintiffs Ahmed Shqeirat ("Shqeirat"), Mohamed Ibrahim ("Ibrahim"), Didmar Faja ("Faja"),

Omar Shahin ("Shahin"), Mahmoud Sulaiman ("Sulaiman"), and Marwan Sadeddin's

("Sadeddin") (collectively "Plaintiffs") Rule 56(f) Motion [Docket No. 54].  Plaintiffs

subsequently filed a Motion to Strike [Docket No. 96] U.S. Airways's November 13, 2007,

Letter [Docket No. 94] to the Court regarding supplemental authority.  For the reasons set forth

below, U.S. Airways's Motion to Dismiss is granted in part and denied in part, U.S. Airways's

Motion for Summary Judgment is denied without prejudice, MAC's Motion to Dismiss is

granted in part and denied in part, Plaintiffs' Rule 56(f) Motion is granted, and Plaintiffs' Motion

to Strike is granted.

## II. BACKGROUND[1]

Plaintiffs are six Imams who traveled to Minneapolis, Minnesota, in November 2006 for

the North American Conference of Imams.  1st Am. Compl. [Docket No. 5] ¶ 24.  Shqeirat, Faja,

Shahin, Sulaiman, and Sadeddin are Arizona residents, and Ibrahim is a California resident.  Id.

¶¶ 12-17.  Shqeirat and Shahin are Muslims of Jordanian-Arab origin, Ibrahim and Sulaiman are

Muslims of Egyptian-Arab origin, Faja is a Muslim of Albanian origin, and Sadeddin is a

Muslim of Syrian-Arab origin.  Id.

On October 29, 2006, Shahin purchased tickets for round-trip air travel on U.S. Airways

from Phoenix International Airport to Minneapolis-St. Paul International Airport.  Id. ¶ 25; U.S.

Airways's Exs. [Docket No. 11] 2-5.[2]  Shahin purchased the tickets for himself, Sulaiman, Faja,

Sadeddin, and Shqeirat.  U.S. Airways's Exs. 2-5.  On November 9, 2006, Shahin purchased an

---

[1] In considering a motion to dismiss, the pleadings are construed in the light most favorable to the nonmoving party, and the facts alleged in the complaint must be taken as true. Hamm v. Groose, 15 F.3d 110, 112 (8th Cir. 1994).

[2] U.S. Airways has provided Plaintiffs' passenger name records (PNRs), which show that Shahin purchased all of Plaintiffs' tickets.  The Court considers the PNRs for the limited purpose of clarifying Plaintiffs' ticket purchase and their seating arrangement for the return flight to Phoenix.

additional ticket for Ibrahim for round trip air travel on U.S. Airways from Phoenix to

Minneapolis.[3]  Id. Ex. 6.  The tickets specified that Shahin would travel from Phoenix to

Minneapolis on U.S. Airways Flight 353 on November 16, 2006, and the other Plaintiffs would

travel from Phoenix to Minneapolis on U.S. Airways Flight 57 on November 18, 2006.  Id. Exs.

2-6.  Plaintiffs all were booked to return to Phoenix on U.S. Airways Flight 300 ("Flight 300"),

scheduled to depart Minneapolis at 5:45 p.m. on November 20, 2006.  1st Am. Compl. ¶ 27.

Plaintiffs' tickets were all for coach class travel.  U.S. Airways's Exs. 2-6.

 Shahin and the other Plaintiffs traveled to Minneapolis on November 16 and 18, 2006,

respectively and attended the North American Conference of Imams.  1st Am. Compl. ¶ 24.  On

November 20, 2006, Plaintiffs arrived at the Minneapolis-St. Paul International Airport planning

to return to Phoenix on U.S. Airways Flight 300.  Id. ¶ 27.  After checking in, Plaintiffs passed

through security without incident and arrived at gate C9 at approximately 3:45 p.m.  Id. ¶ 31.

Plaintiffs conversed with each other in Arabic and English.  Id. ¶ 32.  In the gate area at around

4:20 p.m., Ibrahim, Shahin, and Sulaiman prayed together in observance of the Maghreb early

evening Muslim prayer.  Id. ¶¶ 34-35.  Faja, Sadeddin, and Shqeirat decided not to pray and

instead watched over Plaintiffs' carry-on bags.  Id. ¶ 35.  Faja, Sadeddin, and Shqeirat observed

an older couple intently watching the other Plaintiffs pray.  Id. ¶ 36.  The male in the couple

made a cellular phone call while watching Ibrahim, Shahin, and Sulaiman pray.  Id. ¶ 38.  At

approximately 4:40 p.m., Ibrahim, Shahin, and Sulaiman finished praying.  Id. ¶ 39.

 At approximately 4:55 p.m., gate attendants began boarding procedures for Flight 300.

---

[3] It appears that Ibrahim's origination and ultimate return city was Bakersfield,
California.  See U.S. Airways's Mem. in Supp. of Mot. for Summ. J. [Docket No. 11] at 4; U.S.
Airways's Ex. 6.

Id. ¶ 40.  Shahin, who was automatically upgraded to first class based on his status as a Gold

Member in U.S. Airways's frequent flyer program, sat in row one.  Id. ¶ 26; U.S. Airways's Ex.

2.  Subsequently, Sulaiman assisted Sadeddin, who is blind, in boarding Flight 300.  1st Am.

Compl. ¶ 42.  Initially, Sadeddin sat in his pre-assigned seat in row four and Sulaiman sat in his

seat in row nine.  Id. ¶ 43; U.S. Airways Exs. 3-4.  However, Sadeddin subsequently moved to an

aisle seat in row nine near Sulaiman after another passenger agreed to switch seats so that

Sulaiman could assist his blind friend.  1st Am. Compl. ¶¶ 44-45.

After the seat switch, Sadeddin requested a seatbelt extension because his seatbelt did not

fit him.  Id. ¶ 46.  At about this point in the sequence of events, Shahin left his first class seat,

walked towards Sadeddin, and asked Sadeddin whether he would like to sit in Shahin's seat in

first class.  Id. ¶ 47.  Sadeddin declined the offer.  Id.  Shahin returned to his seat in first class

and requested a seatbelt extension because his seatbelt also did not fit him.  Id. ¶ 48.

Meanwhile, Faja and Shqeirat sat together in their pre-assigned seats in row twenty-five,

and Ibrahim sat in his pre-assigned seat in row twenty-one.  Id. ¶ 50; U.S. Airways's Exs. 4-6.

Shqeirat fell asleep for approximately thirty minutes after boarding.  1st Am. Compl. ¶ 50.

When Shqeirat awoke, he and Faja noticed a police vehicle next to the airplane.  Id. ¶ 51.  Two

MAC police officers, and one undercover MAC officer, boarded the plane and spoke with a

flight attendant in the kitchen at the rear of the aircraft.  Id. ¶ 53.  The officers then approached

the six Plaintiffs and requested that they deplane.  Id. ¶ 54.  Plaintiffs obeyed the request and

exited the aircraft to the jetway.  Id. ¶ 58.

In the jetway, the MAC police officers ordered Plaintiffs to face the wall and place their

hands above their heads to be searched and handcuffed.  Id. ¶ 58.  Faja alleges the police officers

refused his request for a lawyer.  Id. ¶ 72.  In response to a police officer's question, Shqeirat

confirmed that Sadeddin is completely blind.  Id. ¶ 59.  Shqeirat asked the officer to explain the

situation, but the officer responded, "I do not know.  This is the airline's call and not our call."

Id. ¶ 60.  The police officers ordered Plaintiffs to reboard the plane and identify their carry-on

luggage.  Id. ¶ 61.  The police officers then removed Plaintiffs and their carry-on luggage to the

jetway, and the officers thoroughly searched Plaintiffs and their belongings.  Id. ¶ 62-63.  While

handcuffed, Plaintiffs were escorted through the airport and transported in police cars to the

Minneapolis Airport Police Precinct.  Id. ¶ 67.

        Plaintiffs were detained at the police precinct until 11:30 p.m.  Id. ¶ 73.  Shqeirat and

Ibrahim were placed together in a small room.  Id. ¶ 75.  A police officer remained in the room

so the two could not communicate with each other.  Id.  The four other Plaintiffs were held in

separate cells.  Id. ¶ 76.  After several hours, agents of the Federal Bureau of Investigations

("F.B.I.") and the Secret Service interviewed each Plaintiff separately.  Id. ¶¶ 77-97.  Each

Plaintiff was provided with Miranda warnings before he was questioned.  Id.  In response to the

F.B.I. agents' questions, Shqeirat stated he did nothing unusual at the airport and he did not

leave his seat on the aircraft.  Id. ¶¶ 79-80.  Shqeirat stated that Plaintiffs were active Imams in

Arizona.  Id. ¶ 81.  In response to the Secret Service agents' questions, Shqeirat stated he did not

want the President of the United States to be harmed.  Id. ¶ 84.  The other Plaintiffs were asked

similar questions and gave similar answers.  Id. ¶¶ 77-97.  Each Plaintiff denied having discussed

Saddam Hussein and the Iraq war in the gate area or on the plane.  Id.  The F.B.I. agents asked

Sadeddin whether he was blind because a U.S. Airways flight attendant allegedly reported she

believed Sadeddin was faking his blindness.  Id. ¶ 93.  When the interviews were completed, the

F.B.I. and Secret Service agents informed Plaintiffs that they were not deemed security threats, they were cleared of any wrongdoing, and they were free to leave.  Id. ¶ 97.

After being released, Plaintiffs went to the terminal and Faja called U.S. Airways to ask for rebooking on the next available flight to Phoenix.  Id. ¶ 98-99.  When Faja gave the ticketing agent the code on his ticket for Flight 300, the agent informed Faja that Plaintiffs were not permitted to fly with U.S. Airways.  Id. ¶ 100.  In response to questions from Faja and Shqeirat, the F.B.I. agent assured them they were not on a "no fly" list.  Id. ¶ 101.  However, the U.S. Airways ticketing agent refused to speak with the F.B.I. agent regarding Plaintiffs' security status.  Id. ¶ 102.  Shahin called the ticketing agent, who again stated that Plaintiffs could not fly with U.S. Airways.  Id. ¶ 103-104.  At Plaintiffs' request, the F.B.I. agent called U.S. Airways and spoke for twenty minutes with the same ticketing agent.  Id. ¶ 105.  However, despite the F.B.I. agent's assurances that Plaintiffs did not pose a security threat, the ticketing agent reiterated that U.S. Airways would not board Plaintiffs.  Id. ¶¶ 106-07.  Unable to find another flight, Plaintiffs made arrangements to stay at a friend's home on the night of November 20, 2006.  Id. ¶ 108.  That evening, Plaintiffs heard news reports, allegedly based on information provided by U.S. Airways, that Plaintiffs had used cash to purchase one way tickets and were disruptive and uncooperative when they were asked to deplane the aircraft.  Id. ¶ 111.

Between 6:00 a.m. and 7:00 a.m. on November 21, 2006, Shahin again called U.S. Airways and asked that Plaintiffs be booked on a flight to Phoenix.  Id. ¶ 112.  Within two hours, U.S. Airways informed Shqeirat that Plaintiffs could not travel with U.S. Airways.  Id. ¶ 113.  Later that morning, Plaintiffs arrived at the Minneapolis-St. Paul International Airport and went to the U.S. Airways ticketing desk.  Id. ¶ 115.  Shahin presented his credit card and requested

that Plaintiffs be rebooked on the next flight to Phoenix.  Id. ¶ 116.  After consulting with the

U.S. Airways System Operations Control Manager on duty, the ticketing agent informed

Plaintiffs they could not travel on U.S. Airways and she requested that Plaintiffs move away

from the U.S. Airways ticket counter.  Id. ¶ 118.  Plaintiffs complied with the ticketing agent's

request and subsequently purchased tickets and returned to Phoenix on an 11:45 a.m. Northwest

Airlines flight.  Id. ¶ 119.

On March 12, 2007, Plaintiffs filed a Complaint [Docket No. 1] against U.S. Airways,

MAC, and certain John Does.  On March 23, 2007, Plaintiffs filed their Amended Complaint,[4]

asserting claims under federal statutes, and Minnesota statutes and common law against U.S.

Airways and MAC.  The John Does are no longer named as defendants.  Pls.' Notice of

Dismissal [Docket No. 81]; Pls. and U.S. Airways's Stipulation [Docket No. 85].

### III. DISCUSSION

**A.    MAC's Motion to Dismiss**

**1.    Standard of Review**

Rule 12 of the Federal Rules of Civil Procedure provides that a party may move to

dismiss a complaint for failure to state a claim upon which relief can be granted.  Fed. R. Civ. P.

12(b)(6).  In considering a motion to dismiss, the pleadings are construed in the light most

favorable to the nonmoving party, and the facts alleged in the complaint must be taken as true.

Hamm v. Groose, 15 F.3d at 112; Ossman v. Diana Corp., 825 F. Supp. 870, 879-80 (D. Minn.

---

[4] Plaintiffs have moved to file a Second Amended Complaint.  Mot. to Amend 1st Am. Compl. [Docket No. 41].  That motion is currently before Magistrate Judge Arthur J. Boylan.  U.S. Airways's and MAC's instant motions address the allegations in the Amended Complaint, and therefore the Court has limited its consideration to the allegations in the Amended Complaint.

1993).  Any ambiguities concerning the sufficiency of the claims must be resolved in favor of the

nonmoving party.  Ossman, 825 F. Supp. at 880.  "A motion to dismiss should be granted as a

practical matter . . . only in the unusual case in which the plaintiff includes allegations that show

on the face of the complaint that there is some insuperable bar to relief."  Frey v. City of

Herculaneum, 44 F.3d 667, 671 (8th Cir. 1995).

Under Rule 8(a) of the Federal Rules of Civil Procedure, pleadings "shall contain a short

and plain statement of the claim showing that the pleader is entitled to relief."  A pleading must

contain "enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v.

Twombly, 127 S. Ct. 1955, 1974 (2007).

### 2.    Materials Submitted by MAC in Support of its Motion

In support of its Motion to Dismiss, MAC has submitted its official police report of the

November 20, 2006, incident.  Noel Aff. [Docket No. 25] Ex. 1.  Rule 12(b) of the Federal Rules

of Civil Procedure states that "if, on a [12(b)(6)] motion . . . matters outside the pleading are

presented to and not excluded by the court, the motion shall be treated as one for summary

judgment . . . and all parties shall be given reasonable opportunity to present all material made

pertinent to such a motion by Rule 56."

Relying on Rule 10(c), MAC argues that its official police report does not qualify as a

"matter outside the pleading" because it is adopted by reference in Counts Ten and Seventeen of

Plaintiffs' Amended Complaint.  See Fed. R. Civ. P. 10(c) ("Statements in a pleading may be

adopted by reference in a different part of the same pleading or in another pleading or in any

motion.  A copy of any written instrument which is an exhibit to a pleading is a part thereof for

all purposes.").  Count Ten asserts that MAC violated the Minnesota Government Data Practices

Act ("MGDPA"), Minn. Stat. §§ 13.08, subd. 1, and 13.355, subd. 1, when it failed to remove

Shahin's social security number from the police report, which was published on the internet.  1st

Am. Compl. ¶¶ 195-201.  Count Seventeen asserts a claim of invasion of privacy based on the

same conduct.  Id. ¶¶ 256-61.  Significantly, Plaintiffs chose not to attach a copy of the police

report as an exhibit to the Complaint or the Amended Complaint.

The Eighth Circuit recognizes that on Rule 12(b)(6) motions, courts may consider

matters that are "necessarily embraced by the pleadings."  See Porous Media Corp. v. Pall Corp.,

186 F.3d 1077 (8th Cir. 1999), quoting Piper Jaffray Cos. v. Nat'l Union Fire Ins. Co., 967 F.

Supp. 1148, 1152 (D. Minn. 1997).  For example, where a plaintiff's claims arise out of a written

contract, a court may consider an indisputably authentic copy of the contract in deciding a

motion to dismiss.  Stahl v. Dep't of Agric., 327 F.3d 697, 700-01 (8th Cir. 2003).  Similarly, if a

plaintiff's securities law claims are based on allegedly misleading statements in a prospectus, a

court may consider an indisputably authentic copy of the prospectus.  See Parnes v. Gateway

2000, Inc., 122 F.3d 539, 546 n.7 (8th Cir. 1997).

Under Eighth Circuit precedent, this Court may consider MAC's police report in

deciding whether Counts Ten and Seventeen of the Amended Complaint survive MAC's Motion

to Dismiss, because those counts necessarily embrace MAC's police report.  However, MAC

argues that factual statements in its police report regarding the November 20, 2006, incident

support dismissal of the other counts against it.  The difficulty with MAC's position is that,

unlike Counts Ten and Seventeen, the other counts bear no direct connection to MAC's police

report.  Because MAC's police report is not necessarily embraced by the other counts, the Court

cannot consider the police report in addressing the merits of the other counts.  See Jacobs v. City

9

of Chicago, 215 F.3d 758, 766 (7th Cir. 2000) (concluding that police report could not be considered in deciding Rule 12(b)(6) motion).

Alternatively, MAC argues Eighth Circuit precedent allows its police report to be considered in deciding a motion to dismiss as "materials that are part of the public record or do not contradict the complaint." Missouri ex rel. Nixon v. Coeur D'Alene Tribe, 164 F.3d 1102, 1107 (8th Cir. 1999). However, MAC's police report is inconsistent with certain allegations in the Amended Complaint and therefore cannot be considered on MAC's Motion to Dismiss. Further, the Court declines to convert MAC's Motion to Dismiss into a Rule 56 motion for summary judgment. See Fed. R. Civ. P. 12(b). Plaintiffs have filed a well-supported Rule 56(f)[5] Motion and accompanying affidavit explaining the need for discovery regarding the November 20, 2006, incident and MAC's policies regarding detaining and arresting passengers. See Goetz Aff. [Docket No. 58]. Therefore, the Court will only consider MAC's police report in evaluating whether Counts Ten and Seventeen state a claim for relief against MAC.

### 3.    42 U.S.C. § 1983 Claims

In Counts Three and Four of the Amended Complaint, Plaintiffs assert that U.S. Airways and MAC are liable under 42 U.S.C. § 1983, which provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . .

Under the Supreme Court's decision in Monell v. Department of Social Services, 436 U.S. 658,

---

[5] Federal Rule of Civil Procedure 56(f) provides that "[s]hould it appear from the affidavits of a party opposing the [summary judgment] motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance" to allow additional discovery.

690-92 (1978), a governmental entity such as MAC[6] cannot be held liable under § 1983 merely because its employees committed unconstitutional acts. Instead, MAC is liable under § 1983 only if its "custom or policy caused the deprivation of the right protected by the Constitution or federal law." Angarita v. St. Louis County, 981 F.2d 1537, 1546 (8th Cir. 1992).

### a.     Unreasonable Search and Seizure

Count Three of the Amended Complaint alleges that MAC "unlawfully searched and seized Plaintiffs in violation of their Fourth Amendment right to be free from unreasonable searches and seizures." 1st Am. Compl. ¶ 146; see U.S. Const. amend. IV. The Fourth Amendment applies to the states through the Fourteenth Amendment. United States v. Ameling, 328 F.3d 443, 447 (8th Cir. 2003). MAC concedes that Plaintiffs were arrested for purpose of Fourth Amendment analysis. MAC's Reply Mem. in Supp. of Mot. to Dismiss [Docket No. 67]. at 5-6.[7] However, MAC argues that Plaintiffs' Fourth Amendment claim must be dismissed because Plaintiffs' Fourth Amendment rights were not violated and, alternatively, because Plaintiffs have failed to adequately allege that a MAC policy or custom was the moving force behind the constitutional violation.

"An arrest without probable cause is violative of rights secured by the Constitution and

---

[6] MAC is a public corporation under Minn. Stat. § 473.01. MAC's Mem. in Supp. of Mot. to Dismiss [Docket No. 24] at 6.

[7] MAC concedes Plaintiffs were arrested but does not specify the precise moment when Plaintiffs were arrested, as opposed to being briefly detained. See United States v. Sokolow, 490 U.S. 1, 7 (1989) (noting that "police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause"), citing Terry v. Ohio, 392 U.S. 1 (1968). For the purposes of the instant motions, the Court will assume Plaintiffs were arrested at the time they were handcuffed in the jetway after being removed from Flight 300.

can be the basis of recovery pursuant to 42 U.S.C. § 1983." Sartin v. Comm'r of Pub. Safety, 535 F.2d 430, 434 (8th Cir. 1976).  "An officer has probable cause to make a warrantless arrest when the facts and circumstances are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense." United States v. Torres-Lona, 491 F.3d 750, 755 (8th Cir. 2007).  "Probable cause requires only a probability or substantial chance of criminal activity, rather than an actual showing of criminal activity." United States v. Mendoza, 421 F.3d 663, 667 (8th Cir. 2005).

MAC emphasizes that individuals consent to substantial intrusions on their Fourth Amendment interests at airports and onboard commercial aircraft.  See Cassidy v. Chertoff, 471 F.3d 67, 76 (2d Cir. 2006) (noting that "society has long accepted a heightened level of security and privacy intrusion with regard to air travel").  However, although air travelers accept that their persons and luggage are subject to intrusive searches for security purposes, law enforcement authorities still need probable cause to arrest an individual in an airport.  See Florida v. Royer, 460 U.S. 491, 502-07 (1983) (plurality opinion) (finding officers had reasonable, articulable suspicion to stop defendant because of suspected drug possession but lacked probable cause for an arrest).

Based on the allegations in the First Amended Complaint, MAC police officers arrested Plaintiffs premised on information that: (1) three of the Plaintiffs observed the Muslim Maghreb prayer at the gate before boarding Flight 300; (2) Plaintiffs referred to Saddam Hussein and criticized U.S. involvement in Iraq; (3) Shahin and Sadeddin requested seatbelt extensions; and (4) Shahin left his seat to talk to Sadeddin.  See 1st Am. Compl. ¶¶ 32-50.  Whether these facts would lead a reasonable person to conclude that Plaintiffs were committing or were about to

commit a crime such as interfering with flight crew members and attendants is doubtful.  See 49

U.S.C. § 46504 (setting forth elements of Interference with Flight Crew Members and

Attendants).  Plaintiffs have stated a claim that their Fourth Amendment rights were violated.

Moreover, this Court would reach the same result even if MAC's police report were

considered.  MAC Police Officer Bradley Wingate's report states that on November 20, 2006, at

5:38 p.m., he was dispatched to Gate C9 because "U.S. Airways was in the process of denying

six passengers service and they wanted us to stand by as they have the six passengers de-board

the aircraft."  Noel Aff. Ex. 1 at 10.  At Gate C9, U.S. Airways Manager Robby Davis ("Davis")

informed Officer Wingate that a passenger on Flight 300 had reported that six passengers had

engaged in "suspicious activity."  Id.  Davis stated the six passengers "were all of Middle

Eastern descent and three . . . had one-way tickets and no checked luggage," and that "most of

the six passengers requested seatbelt extensions."  Id.

Officer Wingate and Federal Air Marshal Steven Grewenow boarded Flight 300 and

spoke with the reporting passenger.  Id.  According to the passenger:

> He witnessed six Middle Eastern males in the gate area praying and chanting in an
> Arabic dialect.  They chanted the words Allah, Allah, Allah.  He then eavesdropped into
> their conversation and overheard them mention Sad[d]am and heard them curse about the
> U.S. involvement.  He watched them position themselves together facing a certain
> direction and pray again in a group.  He watched them board the plane and they took a
> mysterious seating arrangement throughout the plane.  He stated two were seated in the
> front of the plane, two were seated in the middle, and two were seated in the rear of the
> plane. . . .

Id.  Other MAC police officers arrived to assist Officer Wingate.  Id.  Federal Air Marshal

Grewenow and MAC Police Officer Wingate "agreed the seating configuration, the request for

seatbelt extensions, the prior praying and utterances about Allah and the U.S. in the gate area . . .

was suspicious."  Id.  Officer Wingate contacted F.B.I. Agent Cannizzaro and informed him of

the incident.  Id.  Agent Cannizzaro requested that MAC police detain Plaintiffs so he could interview them.  Id.  Plaintiffs and their luggage were subsequently removed from the plane, searched, and then transported to the MAC Airport Police Department Police Operations Center. Id. at 11.  Plaintiffs were placed in holding cells and interview rooms until they were questioned and released.  Id. at 11-12.

Probable cause is determined based on the objective facts available to the officers at the time of the arrest.  Smithson v. Aldrich, 235 F.3d 1058, 1064 (8th Cir. 2000).  According to its police report, MAC officers arrested Plaintiffs based on the following facts: (1) U.S. Airways reported three of the passengers had one-way tickets and no checked luggage, (2) most of the passengers requested seatbelt extensions, (3) a co-passenger submitted a note to a flight attendant stating that Middle Eastern passengers had prayed very loudly before the flight and criticized United States involvement with Saddam Hussein, and (4) Plaintiffs' seats were spread out throughout the aircraft.  MAC's Reply Mem. at 3-4; Noel Aff. Ex. 1 at 10-11.[8]  Again, it is dubious that these facts would lead a reasonable person to conclude that Plaintiffs were about to interfere with the crew of Flight 300.  Therefore, even if MAC's police report is considered, Plaintiffs have adequately stated a claim that MAC violated their Fourth Amendment rights.

Arguing against this result, MAC emphasizes that the F.B.I. requested that Plaintiffs be detained.  MAC cites cases such as Doran v. Eckold, 409 F.3d 958, 965 (8th Cir. 2005), for the

---

[8] MAC also argues that U.S. Airways's decision to deny service supports a finding of probable cause.  MAC's Reply Mem. at 3-4.  However, 49 U.S.C. § 44902(b) gives an airline discretion to deny service to anyone the airline decides "is, or might be, inimical to safety."  As discussed below, this standard is lenient and does not require probable cause.  Therefore, U.S. Airways's decision to deny service to Plaintiffs is not a component of probable cause.  Only the underlying facts regarding Plaintiffs' conduct relied on by MAC can establish probable cause.

proposition that "law enforcement officers may rely on information provided by others in the law enforcement community, so long as the reliance is reasonable."  However, there is no indication in the police report that F.B.I. Agent Cannizzaro provided any information to Officer Wingate. Instead, the flow of information was one-way: MAC Officer Wingate notified Agent Cannizzaro that U.S. Airways had decided to remove Plaintiffs from Flight 300, and Agent Cannizzarro requested that Officer Wingate detain Plaintiffs for questioning.  On the record before the Court, MAC has no basis to argue that it arrested Plaintiffs based on information provided by the F.B.I.

In the alternative, MAC argues that even if Plaintiffs' arrests were unconstitutional, Plaintiffs have insufficiently alleged that a MAC policy, practice, or custom caused a Fourth Amendment violation.  In the Amended Complaint, Plaintiffs allege that MAC "engaged in a course of action and behavior, rising to the level of a policy, custom and condoned practice, which deprived Plaintiffs of the rights, privileges and immunities secured by the United States Constitution and by federal statute in violation of 42 U.S.C. § 1983."  1st Am. Compl. ¶ 141.

"When a complaint is filed, a plaintiff may not be privy to the facts necessary to accurately describe or identify any policies or customs which may have caused the deprivation of a constitutional right."  Doe v. Sch. Dist. of City of Norfolk, 340 F.3d 605, 614 (8th Cir. 2003). Therefore, " the failure of [Plaintiffs] to specifically plead the existence of an unconstitutional policy or custom, in itself, is not fatal to their claim for relief."  Id.  Instead, a complaint need only "allege facts which would support the existence of an unconstitutional policy or custom." Id.  Paragraphs 58-60, 140-143, and 146 of Plaintiffs' Amended Complaint allege facts that would support the existence of an unconstitutional MAC policy of arresting passengers when an airline reports allegedly suspicious behavior falling short of probable cause.  Therefore, Plaintiffs

have adequately stated a claim that a MAC custom or policy caused the violation of Plaintiffs' constitutional right to be free from unreasonable searches and seizures.

### b.       Equal Protection

Count Three of the Amended Complaint also alleges MAC violated the Fourteenth Amendment's Equal Protection Clause by arresting Plaintiffs "on the basis of their race, religion and[] national origin . . . ."  1st Am. Compl. ¶ 145; <u>see</u> U.S. Const. amend. XIV.  MAC argues Plaintiffs' equal protection claim fails because Plaintiffs have not alleged facts supporting an inference that similarly situated persons of a different race, religion, color, or national origin would have been treated differently.  In support of these arguments, MAC relies on the statement in <u>Yale Auto Parts, Inc. v. Johnson</u>, 758 F.2d 54, 61 (2d Cir. 1985), that an allegation "that others were treated differently" is "essential" to an equal protection claim.  However, MAC has provided no Supreme Court or Eighth Circuit authority supporting that an equal protection claim must be based on an allegation that similarly situated individuals were treated differently.  The Amended Complaint alleges MAC arrested Plaintiffs without probable cause because of Plaintiffs' race and religion.  "These allegations give [MAC] fair notice of what [Plaintiffs'] claims are and the grounds upon which they rest."  <u>Swierkiewicz v. Sorema N.A.</u>, 534 U.S. 506, 514 (2002).  As discussed above, it is dubious whether the facts in the Amended Complaint provide probable cause for an arrest.  The lack of probable cause, along with other evidence adduced through discovery, could support an inference that Plaintiffs' race and religion were motivating factors in MAC's decision to arrest Plaintiffs.  The Amended Complaint contains "enough facts to state a claim to relief that is plausible on its face."  <u>Twombly</u>, 127 S. Ct. at 1974.

Alternatively, MAC again argues that Plaintiffs have failed to sufficiently allege the existence of an unconstitutional policy or custom.  However, the facts alleged in the Amended Complaint support the existence of an unconstitutional custom of arresting individuals without probable cause based on their race.  Therefore, Plaintiffs' equal protection claim against MAC in Count Three of Amended Complaint survives MAC's Motion to Dismiss.

### c.  Sixth Amendment

Plaintiffs did not respond to MAC's argument that the Sixth Amendment right-to-counsel claim asserted in Count Three of the Amended Complaint must be dismissed because Plaintiffs were not charged with a crime.  See MAC's Mem. in Supp. of Mot. to Dismiss at 11-12; Pls.' Mem. in Opp'n to MAC's Mot. to Dismiss [Docket No. 59] at 12-20. Therefore, the claim is dismissed.

### d.  Failure to Train

Count Four of the Amended Complaint alleges that MAC failed to adequately train its employees regarding unlawful discrimination and that, as a result, Plaintiffs were detained without probable cause.  1st Am. Compl. ¶¶ 152-53; see City of Canton v. Harris, 489 U.S. 378, 387-92 (1989) (concluding that municipality can be liable under § 1983 for constitutional violations caused by failure to adequately train employees).  MAC's argument in support of dismissal of Plaintiffs' failure-to-train claim is premised entirely on its previous arguments for dismissal of Plaintiffs' Fourth and Fourteenth Amendment claims.  However, as discussed above, Plaintiffs have adequately stated claims that MAC conducted an unreasonable search and seizure, and that MAC did so because of Plaintiffs' race and religion  Therefore, Plaintiffs' failure-to-train claim against MAC also survives.

4.      **State Law False Arrest**

MAC argues the false arrest allegations in Count Five of the Amended Complaint focus on U.S. Airways and do not clearly state a false arrest claim against MAC.  In response, Plaintiffs argue the previous 156 paragraphs of the Amended Complaint are incorporated by reference in Count Five, and that paragraphs 54, 58, 62, 64, 66-67, 73, and 153 support an allegation that MAC officers falsely arrested Plaintiffs.  Pls.' Mem. in Opp'n to MAC's Mot. to Dismiss at 23.  However, Count Five is ambiguous at best as to whether Plaintiffs are pursuing a false arrest claim against MAC.  Neither MAC nor this Court is required to sift through 156 paragraphs of allegations to determine if Plaintiffs are asserting a false arrest claim against MAC.  See Byrne v. Nezhat, 261 F.3d 1075, 1129 (11th Cir. 2001) (discussing problems where "each count [of a complaint] incorporates every antecedent allegation by reference ").  If Plaintiffs intend to assert a false arrest claim against MAC, then they should clearly so state. Federal Rule of Civil Procedure 8(a) requires only a "short and plain statement of the claim showing that the pleader is entitled to relief."  Plaintiffs' false arrest claim fails to make such a statement regarding MAC, and therefore Count Five against MAC is dismissed.

However, in the event Judge Boylan grants Plaintiffs leave to amend their false arrest claim in a second amended complaint, it is helpful to briefly address MAC's alternative arguments on the merits.  Based on the information in its police report, MAC argues that even a properly stated false arrest claim against it must be dismissed because the decision to arrest Plaintiffs was supported by probable cause.  See Johnson v. Morris, 453 N.W.2d 31, 36 (Minn. 1990) ("If probable cause to arrest exists . . . there is no cause of action for false arrest or false imprisonment.")  However, for the reasons stated above, it is dubious whether probable cause

existed to arrest Plaintiffs.  Therefore, MAC's alternative argument for dismissal of the false arrest claim is rejected.

      **5.**      **Claims Arising Out of the Disclosure of Shahin's Social Security Number**

          **a.**      **Minnesota Government Data Practices Act**

In Count Ten of the Amended Complaint, Plaintiff Shahin alleges MAC violated the MGDPA by posting on the internet the police report showing Shahin's social security number. 1st Am. Compl. ¶ 196.  Shahin also alleges that MAC "intentionally and/or recklessly failed to remove [Shahin's] social security number from the internet."  1st Am. Compl. ¶ 198.  For the purposes of its Motion to Dismiss, MAC concedes that the publication of Shahin's social security number constitutes a violation of the MGDPA.  MAC's Mem. in Supp. of Mot. to Dismiss at 17-18.  However, MAC argues Count Ten must be dismissed because Shahin fails to allege an injury in fact.

The civil remedies provision of the MGDPA provides that "a responsible authority or government entity which violates [the MGDPA] is liable to a person . . . who suffers any damage as a result of the violation . . . ."  Minn. Stat. § 13.08, subd. 1.  The Minnesota Supreme Court in Navarre v. South Washington County Schs., 652 N.W.2d 9, 30 (Minn. 2002), recognized that "this broad language indicates that a plaintiff can recover damages for emotional harm under the MGDPA."  Although Navarre "failed to produce verifiable medical or psychological evidence" of emotional harm, the court held that Navarre's testimony that the "disclosure of information made her extremely upset and caused her to be afraid to go out in public" was sufficient to create a jury issue regarding damages.  Id.

Here, Shahin alleges he "continues and will continue to experience the fear that he may

become the victim of identity theft and fraud and continues and will continue to suffer anguish, injury to his reputation and economic losses . . . in an amount to be proven at time of trial." 1st Am. Compl. ¶ 201. Given the evidentiary threshold for MGDPA emotional harm damages established in Navarre, Shahin's allegations of emotional harm and his fear of possible identity theft are sufficient to state a claim for damages under the MGDPA.

### b.    Invasion of Privacy

In Count Seventeen of the Amended Complaint, Plaintiff Shahin asserts a claim for invasion of privacy based on MAC's alleged disclosure of his social security number. 1st Am. Compl. ¶¶ 256-61. In Lake v. Wal-Mart Stores, Inc., 582 N.W.2d 231, 233-235 (Minn. 1998), the Minnesota Supreme Court first recognized the invasion-of-privacy torts of intrusion upon seclusion, appropriation, and publication of private facts. The Court construes Count Seventeen as asserting a claim for publication of private facts. Minnesota courts define publication of private facts as "an invasion of privacy when one 'gives publicity to a matter concerning the private life of another if the matter publicized is of a kind that (a) would be highly offensive to a reasonable person, and (b) is not of legitimate concern to the public.'" Id. at 233, quoting Restatement (Second) of Torts, § 652B (1977). MAC again argues that Shahin's allegations that he suffered emotional distress are insufficient to support a claim for publication of private facts. However, MAC has not provided any Minnesota case law to support this argument. At this early stage of the litigation, Shahin's allegations that he has suffered emotional harm due to the fear of identity theft is sufficient to support the damages element of his invasion of privacy claim.

Thus, Counts Three, Four, Ten, and Seventeen of the Amended Complaint state claims upon which relief can be granted, and MAC's Motion to Dismiss is denied as to those counts.

Count Five is dismissed because it fails to clearly assert a claim against MAC.

**B.     U.S. Airways's Motion to Dismiss**

**1.     42 U.S.C. § 1983 Claims**

Count Three of the Amended Complaint names U.S. Airways as a co-defendant on the 42 U.S.C. § 1983 claims against MAC.  U.S. Airways argues Plaintiffs' § 1983 claims against it must be dismissed because the Amended Complaint fails to sufficiently allege that U.S. Airways acted under color of state law.

A private person is not liable under § 1983 merely for contacting the police and invoking a police officer's authority.  Young v. Harrison, 284 F.3d 863, 870 (8th Cir. 2002).  Instead, "[p]rivate parties are only liable under 42 U.S.C. § 1983 when they have been jointly engaged with public officers in the denial of civil rights."  Id.  The Eighth Circuit's decision in Murray v. Wal-Mart, Inc.,  874 F.2d 555 (8th Cir. 1989), provides guidance on the pleading standard for § 1983 claims against private parties.  Murray asserted § 1983 claims against Wal-Mart, the City of Blytheville, Arkansas, and other defendants arising out of the City's decision to prosecute her based on Wal-Mart's allegations that Murray had shoplifted.  Id. at 557-58.  After Murray prevailed against Wal-Mart in the district court, Wal-Mart argued on appeal that Murray failed to allege sufficient facts to hold it liable under § 1983.  Id. at 558.  The Eighth Circuit rejected Wal-Mart's argument, emphasizing that:

> [Murray] alleged that "each and all the acts" which she set forth in her complaint "were done by the Defendants under the color and pretense" of state law.  Murray's claim stated that she sustained numerous injuries and damages "as a direct and proximate result of the joint and several conduct[] of the Defendants, which constitute violation of Plaintiff's Constitutional rights."  Murray's complaint also specifically invoked jurisdiction pursuant to section 1983.

Id.  The court concluded that "[t]hese statements more than adequately allege facts sufficient to

state a claim against Wal-Mart under § 1983." Id.

Here, Plaintiffs allege U.S. Airways "was acting under the color of state law when [MAC], under the direction of U.S. Airways, deprived Plaintiffs of their [federal] rights . . . ." 1st Am. Compl. ¶ 142.  Plaintiffs also allege U.S. Airways and MAC "acted in concert" to violate Plaintiffs' federal rights.  Id. ¶ 145.  Additionally, Plaintiffs have alleged that after they were handcuffed, "Shqeirat asked the [MAC] police officer what was going on to which the officer replied: 'I do not know.  This is the airline's call and not our call.'"  Id. ¶ 60.  Under Murray, the Amended Complaint sufficiently alleges that U.S. Airways and MAC jointly violated Plaintiffs' constitutional rights in violation of § 1983.

U.S. Airways also briefly argues that Plaintiffs have insufficiently alleged that a U.S. Airways policy or custom was the moving force behind the alleged constitutional violations. U.S. Airways's Reply Mem. in Supp. of Mot. to Dismiss [Docket No. 73] at 10.  However, Monell does not apply to the conduct of U.S. Airways because U.S. Airways is not a governmental entity.  U.S. Airways has provided no authority to support its argument that Plaintiffs must prove that a U.S. Airways policy or custom was the moving force behind the constitutional violations alleged in Plaintiffs' § 1983 claims.  Plaintiffs' claims alleging joint violation of § 1983 rights is sufficient to deny U.S. Airways's motion for dismissal of Count Three.[9]

**2.     False Arrest**

Count Five of the Amended Complaint asserts a false arrest claim against U.S. Airways.

---

[9] Count Four of the Amended Complaint does not assert a failure-to-train claim against U.S. Airways  See 1st Am. Compl. ¶¶ 151-56.

Plaintiffs allege that: (1) "U.S. Airways unlawfully had Plaintiffs handcuffed and arrested," (2) the arrests were not based on probable cause, (3) U.S. Airways's actions were discriminatory, and (4) MAC police officers performed the arrest based exclusively on the statements of U.S. Airways's employees.  1st Am. Compl. ¶¶ 160, 163-65.

The Minnesota Supreme Court has stated that the "essential elements" of a false arrest claim are: "(1) an arrest performed by defendant, and (2) the unlawfulness of such arrest." Lundeen v. Renteria, 224 N.W.2d 132, 135 (1974).  U.S. Airways argues a claim of false arrest "requires an actual arrest performed by the defendant."  U.S. Airways's Mem. in Supp. of Mot. to Dismiss [Docket No. 15] at 9.  U.S. Airways argues it cannot be liable for false arrest because MAC arrested Plaintiffs.  However, the Minnesota Supreme Court has recognized that a defendant may be liable for instigating an arrest by police officers.  See Ward v. Nat'l Car Rental Sys., 290 N.W.2d 441, 442-43 (Minn. 1980) (false arrest claim adequately supported by evidence that "plaintiff had been imprisoned [by police], that the imprisonment was instigated by defendant, [and] that defendant did not have reasonable cause to believe that a theft of its automobile had occurred").  Therefore, Plaintiffs may state a false arrest claim against U.S. Airways even though MAC actually performed the arrest.

U.S. Airways also argues it is entitled to immunity under 49 U.S.C. § 44941.  That statute provides that:

> Any air carrier . . . who makes a voluntary disclosure of any suspicious transaction relevant to a possible violation of law or regulation, relating to air piracy, a threat to aircraft or passenger safety, or terrorism . . . to . . . any Federal, State, or local law enforcement officer, or any airport or airline security officer shall not be civilly liable to any person under any law or regulation of the United States, any constitution, law, or regulation of any State . . . for such disclosure.

49 U.S.C. § 44941(a).  The text of the statute protects U.S. Airways's disclosure of information

to MAC.  Here, Plaintiffs allege that in addition to disclosing information to MAC, U.S. Airways acted in concert with MAC to arrest Plaintiffs.  Plaintiffs specifically allege that immediately after they were handcuffed and placed under arrest, a MAC police officer stated: "This is the airline's call and not our call."  1st Am. Compl. ¶ 60.  Plaintiffs' false arrest claim alleges conduct by U.S. Airways that falls outside the protection of 49 U.S.C. § 44941(a).

Finally, U.S. Airways argues there was no false arrest because Plaintiffs' arrest was supported by probable cause.  However, for the reasons discussed above, this argument is rejected based on the record currently before the Court.

### 3.      Air Carrier Access Act Claim

In Count Six of the Amended Complaint, Plaintiff Sadeddin asserts a claim under the Air Carrier Access Act ("ACAA"), 49 U.S.C. § 41705, which prohibits air carriers from discriminating against individuals on the basis of a disability.  Sadeddin alleges that U.S. Airways discriminated against him "by claiming that Plaintiff Sadeddin appeared to be faking his blindness."  1st Am. Compl. ¶ 170.  Sadeddin states that as a result, he "was left struggling to descend the steps of the plane unassisted despite his request for aid."  Id. ¶ 171.  U.S. Airways argues Sadeddin's ACAA claim must be dismissed because individuals do not have a private cause of action for ACAA violations.

The ACAA does not expressly create a private cause of action.  However, the Eighth Circuit held in Tallarico v. Trans World Airlines, Inc., 881 F.2d 566, 569-70 (8th Cir. 1989), that the ACAA impliedly creates a private cause of action.  The Tallarico court analyzed the issue under the four factor test set forth by the United States Supreme Court in Cort v. Ash, 422 U.S. 66 (1975):

24

> First, is the plaintiff "one of the class for whose especial benefit the statute was enacted"—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law . . . so that it would be inappropriate to infer a cause of action based solely on federal law?

Cort, 422 U.S. at 78 (citations omitted). However, under the Supreme Court's subsequent decision in Alexander v. Sandoval, 532 U.S. 275 (2001), the second Cort factor—legislative intent to create a private cause of action—is now dispositive: "The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy. Statutory intent on his latter point is determinative." Id. at 286 (citations omitted).

The Eighth Circuit has not yet addressed whether the implied ACAA cause of action recognized in Tallarico survives after Sandoval. The Tenth and Eleventh Circuits, the only two Courts of Appeals to address the issue after Sandoval, have both held a private cause of action does not exist under the ACAA. Boswell v. Skywest Airlines, Inc., 316 F.3d 1263, 1270 (10th Cir. 2004); Love v. Delta Air Lines, 310 F.3d 1347, 1359 (11th Cir. 2002).

Before discussing the ACAA, it is helpful to briefly discuss the facts and reasoning of Sandoval. There, a five-Justice majority concluded that individuals do not have a private cause of action to enforce agency regulations promulgated under § 602 of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d-1. Section 602 stated that "[e]ach Federal department and agency . . . is authorized and directed to effectuate the [anti-discrimination] provisions of [§ 601]." 42 U.S.C. § 2000d-1. The Sandoval Court concluded that § 602 did not contain "rights-creating" language because it focuses on the agencies regulated rather than the individuals

protected.  Sandoval, 532 U.S. at 288-89.  Additionally, even if rights-creating language were present, § 602's elaborate restrictions on agency enforcement action, and the provision for judicial review of such action, "contradict a congressional intent to create privately enforceable rights through § 602 itself."  Id. at 289-90.

The Tallarico court relied heavily on the ACAA's legislative history in determining that Congress intended to create a private cause of action.  Tallarico, 881 F.2d at 570.  However, after Sandoval a court must "begin . . . [its] search for Congress's intent with the text and structure of [the ACAA]."  Sandoval, 532 U.S. at 288.  The ACAA states that "[i]n providing air transportation, an air carrier . . . may not discriminate against an otherwise qualified individual" on the ground that "the individual has a physical . . . impairment that substantially limits one or more major life activities."  49 U.S.C. § 41705(a)(1).  This is not "rights-creating language" because it focuses on regulating the airlines rather than protecting individuals.  Sandoval, 532 U.S. at 289.

Moreover, the elaborate administrative enforcement mechanisms provided by the ACAA contradict an intent to create a private cause of action.  Briefly stated, the statute requires the Department of Transportation to investigate complaints that an air carrier has discriminated against a disabled individual.  49 U.S.C. § 46101(a)(1); 49 U.S.C. § 41705(c)(1).  "After notice and an opportunity for a hearing . . . the [DOT] shall issue an order to compel compliance . . . ."  49 U.S.C. § 46101(a)(4).  The DOT can impose civil penalties.  49 U.S.C. §§ 46301(a)(1)(A), (a)(5)(C).  The DOT or the Department of Justice may file a civil action in a district court to enforce the ACAA.   49 U.S.C. §§ 46106-46107.  Additionally, an individual with "a substantial interest" in a DOT enforcement action can seek review of a DOT order in a United States Court

of Appeals.  49 U.S.C. § 46110(a).  The express creation of an elaborate remedial scheme in the ACAA leads to the inescapable conclusion that Congress intended to preclude a private cause of action in federal district court.  See Boswell, 316 F.3d at 1270; Love, 310 F.3d at 1359; cf. Freeman v. Fahey, 374 F.3d 663, 665-66 (8th Cir. 2004) (concluding that administrative enforcement scheme in 42 U.S.C. § 5309 suggests Congress did not intend to create private cause of action to enforce statute).  As in Sandoval, the text and structure of the ACAA are dispositive, and it is unnecessary to consider the legislative history relied on in Tallarico. Individuals do not have a private cause of action to enforce the ACAA.  Count Six of the Amended Complaint is dismissed.

### 4.    Intentional Infliction of Emotional Distress

Count Eleven of the Amended Complaint asserts a claim against U.S. Airways for intentional infliction of emotional distress.  Under Minnesota law, a claim of intentional infliction of emotional distress has four elements: "(1) the conduct must be extreme and outrageous; (2) the conduct must be intentional or reckless; (3) it must cause emotional distress; and (4) the distress must be severe."  Langeslag v. KYMN Inc., 664 N.W.2d 860, 864 (Minn. 2003).  Regarding the first element, the conduct must be "so atrocious that it passes the boundaries of decency and is utterly intolerable to the civilized community."  Hubbard v. United Press Int'l, Inc., 330 N.W.2d 428, 439 (Minn. 1983) (quotation omitted).

Both federal and Minnesota law prohibit transportation providers such as air carriers from discriminating on the basis of race and national origin.  See, e.g., 49 U.S.C. § 40127(a) ("An air carrier . . . may not subject a person in air transportation to discrimination on the basis of race, color, national origin, religion, sex, or ancestry."); Minn. Stat. § 363A.11, subd. 1

(prohibiting discrimination in places of public accommodation).  U.S. Airways contends that Count Eleven fails to allege extreme and outrageous conduct.  U.S. Airways relies heavily on the unpublished decision in Alasady v. Northwest Airlines Corp., Civ. No. 02-3669, 2003 U.S. Dist. LEXIS 3841 (D. Minn. March 3, 2003) (J. Kyle).  There, plaintiffs, three Muslim men of Middle Eastern descent, alleged Northwest Airlines discriminated against them because of their race when Northwest refused to allow them to board a flight.  Id. at *3-8.  The Alasady court dismissed plaintiffs' claim of intentional infliction of emotional distress because plaintiffs "offered no case in which race or national origin discrimination of the scope and nature alleged here has been deemed 'so atrocious that it passes beyond the boundaries of decency and is utterly intolerable to the civilized community.'"  Id. at *45.

The claims alleged in the Amended Complaint are more severe than the refusal to board a flight as in Alasady.  Unlike the Alsady facts, the Amended Complaint alleges: (1) MAC officers, acting in concert with U.S. Airways, removed Plaintiffs from an airplane flight, arrested Plaintiffs, handcuffed them, and held them in the jetway for forty-five minutes; (2) Plaintiffs were forced to reboard the plane to identify their carry-on luggage in front of the other passengers; (3) Plaintiffs were escorted through the airport in handcuffs; and (4) Plaintiffs were detained for several hours before being questioned and released.  1st Am. Compl. ¶¶ 54-97.  For the purposes of U.S. Airways's Motion to Dismiss, this Court must accept Plaintiffs' allegations that U.S. Airways harbored a discriminatory motive when it took these actions.  These allegations, if proven true, could amount to extreme and outrageous conduct.  Therefore, U.S. Airways's Motion to Dismiss is denied regarding Count Eleven of the Amended Complaint.

**5.      Negligent Infliction of Emotional Distress**

Count Twelve of the Amended Complaint asserts a claim against U.S. Airways for negligent infliction of emotional distress.  "To establish a claim for negligent infliction of emotional distress, a plaintiff must show that she was within a zone of danger of physical impact, reasonably feared for her safety, and suffered severe emotional distress with accompanying physical manifestations."  Wall v. Fairview Hosp. & Healthcare Servs., 584 N.W.2d 395, 408 (Minn. 1998).  [P]roof of physical injury is only a requirement for negligent infliction of emotional distress, not for intentional infliction."  Dornfeld v. Oberg, 503 N.W.2d 115, 118 (1993).  The physical manifestations must arise after and because of emotional distress.  Lickteig v. Alderson, Ondov, Leonard & Sween, P.A., 556 N.W.2d 557, 560 (Minn. 1996).

U.S. Airways argues Plaintiffs have failed to allege that they have suffered physical manifestations of emotional distress.  The Amended Complaint alleges Plaintiffs "suffer humiliation, anxiety to fly, shame, despair, embarrassment, depression, mental pain, anguish, injury to their reputations, and economic losses."  1st Am. Compl. ¶ 217.  The Court finds that these allegations fail to plead the necessary element that Plaintiffs have suffered a physical manifestation of their emotional distress.  See Leaon v. Washington County, 397 N.W.2d 867, 875 (Minn. 1986) (evidence insufficient where plaintiff "testified he lost weight (later regained), became depressed, and exhibited feelings of anger, fear, and bitterness").  Therefore Count Twelve of the Amended Complaint is dismissed.

Arguing against this result, Plaintiffs rely on affidavits that assert new factual allegations.  See Pls.' Exs. [Docket No. 63] 1-4.  Plaintiffs claim they felt physical pain when they were handcuffed, and they allege they suffer from insomnia, nightmares, stress, and anxiety.  Id.  Faja

alleges the ongoing stress he suffers caused him to be admitted to the emergency room in July

2007 for treatment of a panic attack.  Pls.' Ex. 2 ¶ 49.  Shahin alleges he began seeing a

psychologist, also in July 2007.  Pls.' Ex. 1 ¶ 50.  However, these allegations were not made in

the Amended Complaint and cannot be considered.  Moreover, even if considered, these

allegations do not sufficiently allege physical manifestations.  Any physical injuries Plaintiffs

suffered as a result of being handcuffed were not the result of emotional distress, and Plaintiffs'

other new allegations are insufficient.  See Elstrom v. Indep. Sch. Dist. No. 270, 533 N.W.2d 51,

57 (Minn. Ct. App. 1995) (denying recovery where plaintiff suffered from insomnia, crying

spells, a fear of answering the door and telephone, and depression, which caused her to seek

treatment).

Plaintiffs argue in the alternative that this Court should follow the Minnesota Court of

Appeals' decision in Bohdan v. Alltool Manufacturing. Co., 411 N.W.2d 902, 907 (Minn. Ct.

App. 1987), which states that "[a]n exception to the 'zone of danger' rule is that a plaintiff may

recover damages for mental anguish or suffering for a direct invasion of his rights, such as

defamation, malicious prosecution, or other willful, wanton or malicious conduct."  However,

Judge Magnuson persuasively demonstrated in Meyer v. Tenvoorde Motor Co., 714 F. Supp.

991, 995-96 (D. Minn. 1989), that the reasoning in Bohdan is unsound and contradicts well-

settled Minnesota Supreme Court precedent.  Count Twelve of the Amended Complaint is

dismissed.

**C.**      **U.S. Airways's Motion for Summary Judgment**

    **1.**      **U.S. Airways's Arguments Under 49 U.S.C. § 44902; Plaintiffs' Rule 56(f) Motion**

U.S. Airways argues it is entitled to summary judgment because it acted within the discretion provided by the Federal Aviation Act, 49 U.S.C. § 44902, to airlines regarding security-related boarding decisions.  The statute provides that "an air carrier . . . may refuse to transport a passenger or property the carrier decides is, or might be, inimical to safety."  49 U.S.C. § 44902(b).  Courts interpreting this provision have followed the Second Circuit's 1975 decision in Williams v. Trans World Airlines, Inc., 509 F.2d 942, 948 (2d Cir. 1975), which held that under the predecessor to 49 U.S.C. § 44902(b), an airline may be civilly liable for refusing to board a passenger because of safety concerns only if the decision is arbitrary and capricious. See also Cordero v. CIA Mexicana De Aviacion, S.A., 681 F.2d 669 (9th Cir. 1982).  The Williams court specified that:

> The test . . . rests upon the facts and circumstances of the case as known to the airline at the time it formed its opinion and made its decision and whether or not the opinion and decision were rational and reasonable and not capricious or arbitrary in light of those facts and circumstances.  They are not to be tested by other facts later disclosed by hindsight.

Williams, 509 F.2d at 948.  This standard is more lenient than a negligence standard.  The air carrier's decision is protected if "exercised in good faith and for a rational reason."  Dasrath v. Cont'l Airlines, Inc., 467 F. Supp. 2d 431, 444 (D.N.J. 2006).  However, a refusal to board a passenger that is motivated by a passenger's race is inherently arbitrary and capricious.  Bayaa v. United Airlines, Inc., 249 F. Supp. 2d 1198, 1205 (C.D. Cal. 2002) (noting that airline's discretion under § 44902 does not grant it a license to discriminate).

Relying on the declarations of the crew of Flight 300 and other U.S. Airways employees

involved in the November 20, 2006, incident, U.S. Airways argues that the captain's decision to remove Plaintiffs from Flight 300 was not arbitrary and capricious. The captain relied on: (1) a passenger's note alleging that Plaintiffs prayed loudly at the gate and made anti-U.S. comments, (2) Plaintiffs' dispersed seating arrangement, (3) a flight attendant's observations that two of the Plaintiffs had asked for seatbelt extensions but only one seemed to need one, (4) a flight attendant's observation that Shahin moved from first class to coach to talk to Sadeddin during the delay, and (5) information from a U.S. Airways employee that Plaintiffs' passenger name records ("PNRs") indicated that three of the Plaintiffs were traveling on one-way tickets. U.S. Airways's Mem. in Supp. of Mot. for Summ. J. at 9-10; U.S. Airways's Exs. 7-15. U.S. Airways argues that its employees' declarations conclusively show that the captain's decision to remove Plaintiffs from Flight 300 was not arbitrary and capricious, and that the decision was not motivated by Plaintiffs' race.

U.S. Airways has cited cases where courts have granted summary judgment dismissing claims that an airline's refusal to board passenger was motivated by race. See, e.g., Williams, 509 F.2d at 945 n.5, 948-49 (concluding that airline properly relied on FBI's assertion that plaintiff should be considered an armed fugitive, even though subsequent search revealed no weapons); Al-Qudhai'een v. Am. W. Airlines, Inc., 267 F. Supp. 2d 841, 843-44, 848 (S.D. Ohio 2003) (captain's decision based on reports that plaintiffs failed to follow crew member instructions, changed seats without permission, entered first class without permission, pulled cockpit door handle, and asked whether same aircraft would be used for connecting flight to Washington, D.C.); Sedigh v. Delta Airlines, Inc., 850 F. Supp. 197 (E.D.N.Y. 1994) (no liability for captain's decision to remove plaintiff based on reports that plaintiff appeared

nervous, smoked in lavatory, and stated "kill the Jews," even though it was subsequently determined plaintiff did not make the statement).

In response, Plaintiffs have filed a Rule 56(f) motion and affidavit explaining the need for discovery to oppose the evidentiary material submitted by U.S. Airways.  See Goetz Aff.  The Eighth Circuit has noted that Rule 56 "does not require trial courts to allow parties to conduct discovery before entering summary judgment."  Humphreys v. Roche Biomed. Labs., Inc., 990 F.2d 1078, 1081 (8th Cir. 1993).  Instead, a party invoking Rule 56(f)'s protection must "affirmatively demonstrat[e] why he cannot respond to a movant's affidavits . . . and how postponement of a ruling on the motion will enable him, by discovery or other means, to rebut the movant's showing of the absence of a genuine issue of fact."  Willmar Poultry Co. v. Morton-Norwich Prods., Inc., 520 F.2d 289, 297 (8th Cir. 1975).

Plaintiffs have submitted an affidavit asserting a need to depose the crew of Flight 300, the ticketing agent who refused to rebook Plaintiffs, and other U.S. Airways personnel involved in Plaintiffs' removal from Flight 300, the subsequent arrest, and U.S. Airways's refusal to rebook Plaintiffs.  Plaintiffs also state they will seek discovery of any prior incidents of U.S. Airways denying air travel to a passenger for reasons such as the passenger praying at the gate or requesting a seatbelt extension.  Plaintiffs argue such discovery would show that: (1) Plaintiffs were not engaged in activities that could be construed as a safety threat, (2) U.S. Airways and MAC acted in concert to detain and arrest Plaintiffs, and (3) U.S. Airways discriminated against Plaintiffs because of their race and religion.

The Court grants Plaintiffs' Rule 56(f) Motion.  Assuming arguendo that U.S. Airways's decision to remove Plaintiffs from Flight 300 was not arbitrary and capricious, and thus shielded

by 49 U.S.C. § 44902, U.S. Airways may still be liable under 42 U.S.C. § 1983 for claims arising

out of Plaintiffs' arrest and detention.  Plaintiffs' arrest related claims are not covered by 49

U.S.C. § 44902, which applies only to an airline's refusal to board a passenger.  As discussed

above, Plaintiffs' § 1983 claims survive U.S. Airways's Motion to Dismiss.  In pursuing their §

1983 claims, Plaintiffs are likely to depose the crew of Flight 300 and other U.S. Airways

personnel identified in Plaintiffs' Rule 56(f) affidavit.  Thus, U.S. Airways is required to

participate in discovery regardless of whether it acted within its discretion under 49 U.S.C. §

44902 when it removed Plaintiffs from Flight 300.  Moreover, even if Plaintiffs had not named

U.S. Airways as MAC's co-defendant on the § 1983 claims, Plaintiffs would still likely depose

the crew of Flight 300 and other U.S. Airways employees to determine the information that

MAC relied on to detain and arrest Plaintiffs.  Given that U.S. Airways's employees will be

deposed, the merits of U.S. Airways's summary judgment motion, to the extent it relies on 49

U.S.C. § 44902, are best addressed only after the facts are more fully developed through

discovery.  Although U.S. Airways has cited a number of authorities granting summary

judgment to an airline based on 49 U.S.C. § 44902, it appears that significant discovery occurred

in each case.

### 2. Preemption

U.S. Airways argues Plaintiffs' state law claims are preempted by the Airline

Deregulation Act of 1978 ("ADA"), which provides that "a State . . . may not enact or enforce a

law, regulation, or other provision having the force and effect of law related to a price, route, or

service of an air carrier."  49 U.S.C. § 41713(b)(1).  The ADA's preemption provision prevents

state regulation from undermining federal deregulation of competition between the airlines.

Morales v. Trans World Airlines, Inc., 504 U.S. 374, 378-79 (1992).  In the instant case, U.S. Airways argues that Plaintiffs' state law tort claims of false arrest, and intentional infliction of emotional distress, defamation, negligence, failure to train, conspiracy to discriminate, and violations of Minn. Stat. § 363A.11, subd. 1, and Minn. Stat. § 363A.17, are all preempted to the extent they arise out of U.S. Airways's decision to deny transportation to Plaintiffs.

The Supreme Court has interpreted the ADA's preemption provision in two cases.  In Morales, a majority of five Justices held that state consumer protection guidelines regarding airline fare advertising were preempted by the ADA.  504 U.S. at 391.  The Court reasoned that the words "relating to" in the ADA's preemption provision "express a broad pre-emptive purpose."  Id. at 383.  Therefore, "[s]tate enforcement actions having a connection with or reference to airline 'rates, routes, or services' are preempted . . . ."  Id. at 384.  The Court held that the consumer protection guidelines at issue "related to" airline fares because the guidelines explicitly regulated airline fare advertising.  Id. at 388.  The Court further noted that "beyond the guidelines' express reference to fares, it is clear as an economic matter that state restrictions on fare advertising have the forbidden significant effect on fares."  Id.

The Supreme Court revisited the ADA's preemption provision in American Airlines, Inc. v. Wolens, 513 U.S. 219 (1995).  Plaintiffs sued for breach of contract and violations of the Illinois Consumer Fraud Act based on American Airlines's retroactive modification of its frequent flyer program.  Wolens, 513 U.S. at 224-25.  The Court stated that the plaintiffs' claims clearly related to air carrier "rates," such as "mileage credits for free tickets and upgrades," and air carrier "services," such as "access to flights and class-of-service upgrades."  Id. at 226.  The Court held that Plaintiffs' consumer fraud act claims were similar to those in Morales and thus

were preempted.  Id. at 227-28.  However, the breach of contract claims were not preempted

because enforcing the airline's private contracts did not amount to a state's enforcement of a

"law, regulation, standard, or other provision having the force and effect of law" within the

meaning of the ADA's preemption clause.  Id. at 228-29.

In the instant case, resolution of U.S. Airways's preemption argument turns on the

ADA's definition of "service."  The Supreme Court has stated in dicta that "access to flights and

class-of-service upgrades" qualify as an air carrier "service."  Id. at 226.  The Courts of Appeals

are divided on the issue.  The Ninth and Third Circuits define service as "the prices, schedules,

origins and destinations of the point-to-point transportation of passengers, cargo, or mail," but

not the "provision of in-flight beverages, personal assistance to passengers, the handling of

luggage, and similar amenities." Charas v. Trans World Airlines, Inc., 160 F.3d 1259, 1261 (9th

Cir. 1998) (en banc); Taj Majal Travel, Inc. v. Delta Airlines Inc., 164 F.3d 186, 194 (3d Cir.

1998) (adopting the Ninth Circuit's approach).  The Ninth Circuit has held that the ADA does

not preempt state law claims premised on a discriminatory denial of boarding.  See Newman v.

American Airlines, Inc., 176 F.3d 1128, 1131 (9th Cir. 1999) ("As used in a public utility sense,

the term 'service' does not refer to alleged discrimination to passengers due to their

disabilities.").

The Fourth, Fifth, Seventh, and Eleventh Circuits define an airline's "services" more

broadly to include boarding procedures.  See Branche v. Airtran Airways, Inc., 342 F.3d 1248,

1257-59 (11th Cir. 2003) (stating that "services" includes "the physical transportation of

passengers . . . and the incidents of that transportation over which air carriers compete"); Smith

v. Comair, Inc., 134 F.3d 254, 259 (4th Cir. 1998) ("Undoubtedly, boarding procedures are a

service rendered by an airline."); Hodges v. Delta Airlines, Inc., 44 F.3d 334, 336 (5th Cir. 1995) (en banc) (defining service as contractual features of air transportation, including "ticketing, boarding procedures, provision of food and drink, and baggage handling, in addition to the transportation itself"); Travel All Over The World, Inc. v. Kingdom of Saudi Arabia, 73 F.3d 1423, 1433 (7th Cir. 1996) (adopting definition set forth in Hodges).

The Eighth Circuit in Botz v. Omni Air International, 286 F.3d 488, 495 (8th Cir. 2002) noted the circuit split regarding the definition of "service," but the Botz court did not settle on a definition. Botz, a flight attendant, was terminated for refusing a flight assignment she believed violated federal safety regulations. Id. at 490. The Eighth Circuit held that Botz's claims under the Minnesota whistleblower statute, Minn. Stat. § 181.931-.935, were preempted by the ADA because enforcement of the statute would effectively "authoriz[e] a flight attendant to refuse assignments and protect[] her when she does." Botz, 286 F.3d at 495. Such statutory protections "have a forbidden connection with an air carrier's service under any reasonable interpretation of Congress's use of the word 'service.'" Id., citing Charas, 160 F.3d at 1265-66, and Hodges, 44 F.3d at 336. Although the Botz court did not decide the boundaries of the term "service," it noted that "it is apparent from the preemption provision's plain language that it has a broad preemptive effect on state law claims involving air-carrier prices, routes, or services." Id. at 494.

In Alasady, Judge Kyle held that three Muslim plaintiffs' state law claims arising out of Northwest's refusal to board them were not preempted by the ADA. 2003 U.S. Dist. LEXIS 3841 at *32. The Alasady court adopted the Fifth Circuit's broad definition of "services of an air carrier" and held that boarding procedures are such a "service." Id. at *24. However, the court held that "preemption of state laws that ensure equal access to public accommodations would do

nothing to further the purposes of the ADA—namely the fostering of 'maximum reliance on competitive market forces.'" Id. at *31-32.  The court reasoned that "refraining from the violation of individuals' civil rights is not a theory of competition."  Id.

U.S. Airways urges this Court to reject the reasoning in Alasady and hold that Plaintiffs' state law claims are preempted by the ADA.  However, at least two district courts have held that discovery is necessary before resolving preemption arguments in cases where plaintiffs allege a discriminatory denial of boarding by an airline.  The court in Woodson v. U.S. Airways, Inc. 67 F. Supp. 2d 554 (M.D.N.C. 1999), noted that:

> [R]esolving the preemption issue at this stage will not conclude the case because Plaintiff's [federal] claims will proceed at least to the summary judgment stage. Accordingly, because this issue presents an important and difficult question of first impression within this circuit and which involves an issue which may not be appropriate for resolution at the pleading stage, the court will deny Defendants' motion to dismiss Plaintiffs' claims based on state law.  The court will reconsider this issue, if necessary at the summary judgment stage.

Id. at 557; see also Chowdhury v. Nw. Airlines Corp., 238 F. Supp. 2d 1153, 1157 (N.D. Cal. 2002).  The same reasoning applies in this case.  Given the divergent approaches courts take on the preemption issue, and the fact that Plaintiffs' state law claims are unlikely to broaden the scope of discovery, the Court will resolve the preemption issue based on facts adduced through discovery, rather than based on the untested allegations of the Amended Complaint and the declarations submitted by U.S. Airways.  Therefore, U.S. Airways's Motion for Summary Judgment is denied without prejudice and Plaintiffs' Rule 56(f) Motion is granted.

**D.     Plaintiffs' Motion to Strike**

In a letter of October 17, 2007, U.S. Airways notified the Court of the Ninth Circuit's decision in Montalvo v. Spirit Airlines, Inc., No. 05-15640, 2007 U.S. App. LEXIS 23252 (9th

38

Cir. Oct. 4, 2007), dismissing claims against defendant airlines for negligent failure to warn passengers about the risk of deep vein thrombosis during flight.  Id. at *20.  The Ninth Circuit held these claims were impliedly preempted by the Federal Aviation Act because "federal law occupies the entire field of aviation safety.  Congress' intent to displace state law is implicit in the pervasiveness of the federal regulations, the dominance of the federal interest in this area, and the legislative goal of establishing a single, uniform system of control over air safety."  Id. at *19.  In its October 17 letter, U.S. Airways asserted that the "'implied preemption issue' is distinct from, and in addition to, our argument that the Airline Deregulation Act specifically preempts Plaintiffs' state law claims."  U.S. Airways's Oct. 17, 2007 Letter.

By letter dated October 22, 2007 [Docket No. 92], Plaintiffs argued that Montalvo is distinguishable from the instant case.  In a letter dated November 13, 2007, U.S. Airways responded that Montalvo supports "the argument that Plaintiffs' state law claims are preempted based on a theory of implied field preemption of aviation safety issues."  U.S. Airways's Nov. 13, 2007, Letter.  In their Motion to Strike, Plaintiffs contend that U.S. Airways's November 13 letter is an unsolicited memorandum of law prohibited by Local Rule 7.1(f).

The implied preemption argument was available to U.S. Airways when it filed its Motion for Summary Judgment.  See, e.g., Abdullah v. Am. Airlines, 181 F.3d 363, 376 (3d Cir. 1999) ("Because we find Congress's intent to regulate interstate and international air safety to be unambiguous, we hold that state and territorial standards of care in aviation safety are federally preempted.").  However, in its memoranda of law, U.S. Airways did not clearly assert an implied field preemption argument.  See U.S. Airways's Mem. in Supp. of Mot. for Summ. J. at 24-32; U.S. Airways's Reply Mem. in Supp. of Mot. for Summ. J. at 11-14.  U.S. Airways cannot

remedy its failure to brief the implied field preemption issue by submitting letters that amount to unsolicited supplemental memoranda of law.  Plaintiffs' Motion to Strike U.S. Airways's November 13, 2007, Letter is granted.

# IV. CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.  Defendant U.S. Airways's Motion to Dismiss [Docket No. 13] is **DENIED IN PART** and **GRANTED IN PART**;

2.  Counts Six and Twelve of the Amended Complaint [Docket No. 5] are **DISMISSED**;

3.  Defendant U.S. Airways's Motion for Summary Judgment [Docket No. 9] is **DENIED WITHOUT PREJUDICE**;

4.  Defendant Metropolitan Airport Commission's Motion to Dismiss [Docket No. 6] is **DENIED IN PART** and **GRANTED IN PART**;

5.  Count Five of the Amended Complaint is **DISMISSED** to the extent Plaintiffs are asserting a claim against MAC;

6.  Plaintiffs' Rule 56(f) Motion [Docket No. 54] is **GRANTED**; and

7.  Plaintiffs' Motion to Strike [Docket No. 96] is **GRANTED** regarding U.S. Airways's November 13, 2007, Letter [Docket No. 94].


BY THE COURT:


_____s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  November 20, 2007.

41