# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Ahmed Shqeirat, Mohamed Ibrahim,
Didmar Faja, Omar Shahin, Mahmoud
Sulaiman, and Marwan Sadeddin,

              Plaintiffs,

      v.

U.S. Airways Group, Inc.,
U.S. Airways, Inc.,
Metropolitan Airports Commission,
Bradley Wingate, individually and in
his official capacity, Roby Desubijana,
individually and in his official
capacity, Matthew Edwards,
individually and in his official
capacity, Sean Hoerdt, individually
and in his official capacity, Jason
Ericksen, individually and in his
official capacity, David Karsnia,
individually and in his official
capacity, and Michael N. Cannizzaro,
individually and in his official
capacity,

              Defendants.

**MEMORANDUM OPINION
AND ORDER**
Civ. No. 07-1513 ADM/AJB

_____

Omar T. Mohammedi, Esq., Law Firm of Omar T. Mohammedi, LLC, New York, NY, and
Frederick J. Goetz, Esq., Goetz & Eckland P.A., Minneapolis, MN, argued on behalf of
Plaintiffs.

Raoul D. Kennedy, Esq., Skadden, Arps, Slate, Meagher & Flom LLP, San Francisco, CA,
argued on behalf of U.S. Airways Group, Inc., and U.S. Airways, Inc.

Timothy R. Schupp, Esq., Flynn, Gaskins & Bennett, L.L.P., Minneapolis, MN, argued on behalf
of the Metropolitan Airports Commission, Bradley Wingate, Roby Desubijana, Matthew
Edwards, Sean Hoerdt, Jason Ericksen, and David Karsnia.

Chad A. Blumenfield, Assistant United States Attorney, Minneapolis, MN, argued on behalf of
Michael N. Cannizzaro.

_____

## I. INTRODUCTION

On May 5, 2009, the undersigned United States District Judge heard oral argument on Defendant Michael N. Cannizzaro's ("Cannizzaro") Motion to Dismiss [Docket No. 230], Defendants Bradley Wingate ("Wingate"), Roby Desubijana ("Desubijana"), Matthew Edwards ("Edwards"), Sean Hoerdt ("Hoerdt"), Jason Ericksen ("Ericksen"), and David Karsnia's ("Karsnia") (collectively the "MAC Defendants") Motion for Summary Judgment [Docket No. 233], and Defendants U.S. Airways Group, Inc. and U.S. Airways, Inc.'s (collectively "U.S. Airways") Motion for Summary Judgment [Docket No. 240]. The Court also heard oral argument on Plaintiffs Ahmed Shqeirat ("Shqeirat"), Mohamed Ibrahim ("Ibrahim"), Didmar Faja ("Faja"), Omar Shahin ("Shahin"), Mahmoud Sulaiman ("Sulaiman"), and Marwan Sadeddin's ("Sadeddin") (collectively "Plaintiffs") Second Motion for Relief Per Rule 56(f) [Docket No. 273]. For the reasons set forth below, Cannizzaro's Motion is granted in part and denied in part, the MAC Defendants' Motion is denied, U.S. Airways' Motion is granted, and Plaintiffs' Motion is denied.

## II. BACKGROUND[1]

All six Plaintiffs are imams, Islamic religious leaders, residing in the United States. Goetz Aff. [Docket No. 269], Ex. A (Shahin Dep.) at 17-18, 54; Ex. B (Shqeirat Dep.) at 17; Ex. C (Sadeddin Dep.) at 17-18; Ex. D (Faja Dep.) at 17-21. Shahin is a U.S. citizen residing in Phoenix, Arizona. Shahin Dep. at 5, 20. Shqeirat is a U.S. citizen residing in Tempe, Arizona.

---

[1] In considering a motion to dismiss, the pleadings are construed in the light most favorable to the nonmoving party, and the facts alleged in the complaint must be taken as true. Hamm v. Groose, 15 F.3d 110, 112 (8th Cir. 1994). On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party. Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995). Thus Plaintiffs at this stage in the proceedings are by law entitled to all inferences in their favor.

2

Shqeirat Dep. at 5, 30.  Sadeddin, who is totally blind as the result of a degenerative disorder, is a U.S. citizen who lives in Phoenix, Arizona.  Sadeddin Dep. at 5, 8, 11-13.  Sulaiman and Faja currently reside in Arizona, and Ibrahim currently resides in California.  Faja Dep. at 21; 3d Am. Compl. [Docket No. 225] ¶¶ 13, 16.

From November 18 through 20, 2006, Plaintiffs attended the North American Imams Federation ("NAIF") conference held in Minneapolis, Minnesota.  Shahin Dep. at 31-32.  Shahin is on NAIF's Board of Trustees and purchased round trip airline tickets for himself and the other Plaintiffs on U.S. Airways.  Id. at 29, 56-57.  Before attending the conference, Shahin contacted the FBI's Public Relations Officer in Minnesota to inform him about the conference and invited the FBI to give a presentation.  Id. at 67-70.  The FBI was unable to send an official to the conference.  Id.

Plaintiffs were ticketed on a U.S. Airways flight ("Flight 300") on November 20, 2006, from Minneapolis, Minnesota to Phoenix, Arizona.  Goetz Aff., Ex. E.  On the day of their flight, they took a hotel shuttle to the airport and arrived to check-in at approximately 3:30 p.m.  Shahin Dep. at 71.  Plaintiffs each checked in and received a seat assigned to them by U.S. Airways.  Id. at 62; Shqeirat Dep. at 46, 49; Sadeddin Dep. at 60-61; Faja Dep. at 38.  They passed through the security checkpoint and proceeded to Gate C-9 to await boarding.  Shahin Dep. at 75.  Because there were insufficient open seats at Gate C-9, Plaintiffs sat in seats near C-10.  Id. at 79-80.

Observant Muslims typically pray five times a day, and the prayers are time sensitive.  Id. at 72; Shqeirat Dep. at 65.  When traveling, Muslims may combine prayers or wait until they arrive at their destination to pray.  Shahin Dep. at 72.  Muslims often pray in airports when they travel, and Plaintiffs had never previously experienced problems when they prayed nor had they

witnessed problems when other Muslims prayed in airports across the United States.  Shqeirat

Dep. at 208-209.

Around 4:20 p.m., Shahin, Sulaiman, and Ibrahim decided to pray the final two prayers

of the day: Maghreb (sunset prayer) and Ishaa (evening prayer).  Id. at 63, 65.  The three men

faced northeast with Sulaiman, the prayer leader, in front.  Shahin Dep. at 92, 249.  The other

three Plaintiffs remained in their seats to secure the luggage.  Shqeirat Dep. at 64-65.  Sulaiman

recited verses of the Koran, leading the others through the stages of the prayers and speaking

loud enough to enable Shahin and Ibrahim to hear him.  Shahin Dep. at 90-93.  During the

prayer, Sulaiman, Shahin, and Ibrahim changed positions from standing to kneeling to

prostrating.  Id. at 249.  Sulaiman would signal to the others that it was time to move by saying

"Allah Akbar."  Id.  The men prayed for roughly five minutes.  Id. at 90.

Soon after the three men finished praying, U.S. Airways began boarding Flight 300.  Id.

at 95.  As a frequent flyer who had been upgraded to first class, Shahin boarded first and sat in

his assigned window seat in the first row.  Id. at 96-97; Mohammedi Aff. [Docket No. 268] Ex. 1

(Shahin Aff.) ¶ 3.  Shqeirat and Faja boarded the plane next to sit in their assigned adjoining

seats at the back of the aircraft.  Shqeirat Dep. at 82-83.  Next, Sulaiman guided Sadeddin onto

the plane, and Sadeddin took his assigned seat.  Sadeddin Dep. at 57, 60.  Sulaiman asked

another passenger if he would switch seats with Sadeddin so the two imams could sit together,

and the passenger helped Sadeddin to a seat across the aisle from Sulaiman in the middle of the

plane.  Id. at 61-63.  The obliging passenger then took Sadeddin's assigned seat.  Id.  Ibrahim

also boarded the plane.

While the boarding process continued, Shahin went back into the main cabin to offer to

switch his first class seat with Sadeddin, but Sadeddin declined the offer.  Shahin Dep. at 106-08.

Upon returning to the first class cabin, the 6'1", 285 pound, Shahin requested and received a

seatbelt extension from the flight attendant.  Id. at 109-11.  The 5'11", 250 pound Sadeddin also

requested and received a seatbelt extension.  Mohammedi Aff. Ex. 3 (Sadeddin Aff.) ¶ 8.

Sadeddin Dep. at 63-65.

The pilot twice announced that Flight 300 was being delayed beyond its scheduled

departure time.  Faja Dep. at 58.  After the second announcement, both Faja and Shqeirat saw

police cars near the plane.  Id.; Shqeirat Dep. at 85.

Wingate, Desubijana, Hoerdt, and Edwards were all Metropolitan Airports Commission

("MAC") officers on duty on November 20, 2006.  Schupp Aff. [Docket No. 237], Ex. A

(Wingate Dep.) at 56; Ex. B (Desubijana Dep.) at 52; Ex. C (Hoerdt Dep.) at 19; Ex. D (Edwards

Dep.) at 41.  All of the officers were at or near the Lindbergh terminal when dispatch received

the following call from U.S. Airways:

> Dispatch:      (inaudible)
>
> Penny:             Hi, this is Penny with U.S. Airways.
>
> Dispatch:      Okay.
>
> Penny:             We have a situation on a flight down at Gate C-9.
>
> Dispatch:      Okay.  What's the problem?
>
> Penny:             Where a note was passed–do you want me to go into detail or–
>
> Dispatch:      Oh, just give me an idea of what–what's going on.
>
> Penny:             We're going to be pulling off six Arabic passengers.  There was
>                    some behavior in the gate area and also on the aircraft.
>
> Dispatch:      Okay.  And what were they doing?

| | |
|---|---|
| Penny: | In the gate area, they were praying very loudly.  A passenger handed us a note–or the flight crew a note that one of the– |
| Dispatch: | (inaudible).  One of these people handed the flight attendant a note? |
| Penny: | Not– |
| Dispatch: | Oh. |
| Penny: | –one of these people, just another passenger– |
| Dispatch: | Okay.  Yup. |
| Penny: | –saying that they were all praying together saying Allah, Allah, Allah– |
| Dispatch: | 47 dispatch (inaudible). |
| Penny: | –and cursing U.S. (inaudible) involvement with Saddam before the flight. |
| Dispatch: | Okay. |
| Penny: | And three of the passengers were booked on an earlier flight, on the 18th of November.  All missed their flight, and we re-booked one way going to Phoenix today. |
| Dispatch: | Okay.  So do you want an officer down there while you pull these people off; is that what you are saying? |
| Penny: | I'd probably say a couple officers. |

Id., Ex. E (dispatch tape).  The dispatcher directed Desubijana and Wingate to Gate C-9 to assist

U.S. Airways in deplaning some passengers.  Id.; Desubijana Dep. at 91.  Wingate was the first

officer to respond to the call, and he interviewed U.S. Airways manager Robby Davis ("Davis")

in the jetway.  Wingate Dep. at 150-51.  Davis informed Wingate that U.S. Airways was going to

deny service to six passengers on Flight 300.  Id. at 154.  Davis related that a passenger had

observed suspicious behavior and handed the pilot a note about it, some of the individuals had

checked no luggage, some had asked for seatbelt extensions, some had one-way tickets, and all

six were of Middle Eastern descent.  Id.  Davis then gave Wingate a copy of the passenger's

note.  Id. at 181.  The handwritten note said:

> 6 suspicious Arabic men on plane, spaced out in their seats.  All were
> together, saying ". . . Allah . . . Allah," cursing U.S. involvement w/
> Saddam before flight—1 in front exit row, another in first row 1st
> class, another in 8D, another in 22D, two in 25 E&F.

Schupp Aff., Ex. G.

   While Officer Wingate spoke to Davis, fellow officers Desubijana, Hoerdt, and Edwards

arrived at the gate.  Desubijana Dep. at 94-96; Hoerdt Dep. at 21; Edwards Dep. at 46.  Hoerdt

and Edwards responded to the call because of the number of passengers involved.  Hoerdt Dep.

at 20-21.  Hoerdt arrived with Federal Air Marshal Steven Grewenow ("Grewenow") who was

accompanying Hoerdt on his rounds.  Id.; Edwards Dep. at 46; Wingate Dep. at 172-73.  After

finishing his conversation with Davis, Wingate conferred with Desubijana and Grewenow to

apprise them of the situation, and the three men decided to investigate the credibility of the

reporting party.  Wingate Dep. at 173.  Wingate and Desubijana boarded the plane and

interviewed the passenger who had written the note.  Id. at 175.  The note author stated that he

had seen six Middle Eastern men praying loudly in Arabic in the gate area and saying "Allah,

Allah."  Id. at 176.  He also told the officers that the men talked about Saddam Hussein, U.S.

involvement in Iraq, and cursed about the United States.  Id. at 176-77.  He stated that Plaintiffs

took a "mysterious" or "weird" seating arrangement upon boarding the plane and identified

where in the plane Plaintiffs were seated.  Id. at 179-80.

   After leaving the plane, Wingate conferred with Grewenow and decided the request for

seatbelt extensions, the praying and utterances prior to boarding, and the seating configuration amounted to suspicious behavior.  Id. at 187.  Wingate then spoke with the other officers, including Ericksen and Karsnia, and explained the situation to them.  Id. at 187-89.  Complying with MAC protocol to inform the Federal Bureau of Investigation ("FBI") of suspicious incidents occurring aboard aircraft, Ericksen called the FBI and Wingate shared the information he had collected with the FBI.  Id. at 189-90.  Cannizzaro said he and his partner were en route to the scene and requested that Wingate detain Plaintiffs for questioning.  Id. at 206.

Wingate and Desubijana reboarded the plane and, beginning at the rear of the aircraft, approached all six Plaintiffs, and instructed them to leave the aircraft.  Id. at 208.  The officers arranged Plaintiffs in a line-up about a foot apart from one another on the jetway and commanded that they not talk.  Sadeddin Dep. at 92.  Wingate testified that Plaintiffs were not free to leave.  Wingate Dep. at 214. The officers identified Plaintiffs by name and date of birth and eventually escorted those who had carry-on baggage still on the plane back into the cabin to retrieve their bags.  Id. at 217-18.  The bags were placed on the jetway, and a canine unit was summoned to sweep the bags for explosives.  Id.  No explosives were found.  Id. at 219.  While Plaintiffs were detained on the jetway, no officer contacted TSA to determine if any Plaintiff had been identified as a security risk.  Id. at 221. While Plaintiffs were detained on the jetway, a flight attendant told Wingate that she noticed three Plaintiffs praying before the flight, that two Plaintiffs requested seatbelt extensions, and that, in her opinion, the extensions were not necessary given their sizes.  Id. at 223; Ex. F (Wingate Report).

Plaintiffs were detained on the jetway for about one hour.  Sadeddin Dep. at 73.  A decision was made to transport Plaintiffs to the police operations center, and two additional

officers were dispatched to assist with transport.  Wingate Dep. at 223-24.  The officers

handcuffed Plaintiffs, conducted a pat search, and removed and bagged Plaintiffs' personal

items.  Wingate Dep. at 224; Desubijana Dep. at 113; Hoerdt Dep. at 32-34; Shahin Dep. at 128-

29; Sadeddin Dep. at 72-73.  Plaintiffs were led down the outside stairs of the jetway and into

police cars in full view of the passengers on Flight 300.  Shahin Dep. at 130.  At the police

command center, Plaintiffs were placed in separate, isolated locations and interrogated by the

FBI and Secret Service for several hours.  Edwards Dep. at 98-99; Wingate Dep. at 243-44;

Shahin Dep. at 135-37.  Plaintiffs were released from custody at 11:30 p.m., approximately five

to six hours after they had been removed from the aircraft by the MAC Defendants.  Shqeirat

Dep. at 110.  No Plaintiff was charged with any offense arising from this incident.  The

following day, Plaintiffs attempted to re-book a flight home on U.S. Airways, but U.S. Airways

denied them service.  3d Am. Compl. ¶¶ 122-28.  Plaintiffs returned home on a different airline.

Id. ¶ 129.

### III.  DISCUSSION

**A.**     **FBI Agent Cannizzaro's Motion to Dismiss**

**1.**        **The Motion to Dismiss Standard**

Rule 12 of the Federal Rules of Civil Procedure provides that a party may move to

dismiss a complaint for failure to state a claim upon which relief can be granted.  Fed. R. Civ. P.

12(b)(6).  In considering a motion to dismiss, the pleadings are construed in the light most

favorable to the nonmoving party, and the facts alleged in the complaint must be taken as true.

Hamm, 15 F.3d at 112; Ossman v. Diana Corp., 825 F. Supp. 870, 879-80 (D. Minn. 1993).  Any

ambiguities concerning the sufficiency of the claims must be resolved in favor of the nonmoving

party. <u>Ossman</u>, 825 F. Supp. at 880.  Under Rule 8(a) of the Federal Rules of Civil Procedure,

pleadings "shall contain a short and plain statement of the claim showing that the pleader is

entitled to relief."  A pleading must contain "enough facts to state a claim to relief that is

plausible on its face." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007).[2]  "A claim has

facial plausibility when the plaintiff pleads factual content that allows the court to draw a

reasonable inference that the defendant is liable for the misconduct alleged." <u>Ashcroft v. Iqbal</u>,

129 S.Ct.1937, 1949 (2009).  Determining whether a complaint states a plausible claim for relief

is "a context-specific task that requires the reviewing court to draw on its judicial experience and

common sense." <u>Id.</u>  "But where the well-pleaded facts do not permit the court to infer more

than the mere possibility of misconduct, the complaint has alleged–but not 'shown'–'that the

pleader is entitled to relief.'" <u>Id.</u> (quoting Fed. R. Civ. P. 8(a)(2)).

### 2.    Immunity Under 6 U.S.C. § 1104

Cannizzaro seeks the protection of immunity under 6 U.S.C. § 1104.  Congress enacted §

1104 to protect individuals who report suspicious activity to law enforcement and was passed in

2007, at least in part in direct response to this lawsuit.  The portion of the statute protecting

private individuals, such as passengers, is no longer at issue in this case.[3]  Apparently, this Court

is the first to construe § 1104 as it applies to the response of law enforcement.  Section 1104,

Immunity for Reports of Suspected Terrorist Activity or Suspicious Behavior and Response,

---

[2] Because Cannizzaro was first named as a party in the Third Amended Complaint, Plaintiffs have conducted considerable discovery, and the record now includes more facts than recited in the Third Amended Complaint.  However, for the purposes of this Motion to Dismiss, only the allegations pleaded in the Third Amended Complaint will be considered.

[3] Plaintiffs voluntarily dismissed the John Doe passengers from the suit in August 2007. Notice of Voluntary Dismissal [Docket No. 81].

provides:

> (b) Immunity for response
>
> (1) In general
>
> Any authorized official who observes, or receives a report of, covered activity and takes reasonable action in good faith to respond to such activity shall have qualified immunity from civil liability for such action, consistent with the applicable law in the relevant jurisdiction.

An "authorized official" is defined as "any Federal, State, or local law enforcement officer." Id.

(d)(1)(C). "Covered activity" is defined as:

> [A]ny suspicious transaction, activity, or occurrence that involves, or is directed against, a passenger transportation system or vehicle or its passengers indicating that an individual may be engaging, or preparing to engage, in a violation of law relating to–
>
> > (A) a threat to a passenger transportation system or passenger safety or security; or
> >
> > (B) an act of terrorism (as that term is defined in section 3077 of Title 18).

Id. (d)(2).

Plaintiffs' original Complaint [Docket No. 1] was filed on March 12, 2007. Two weeks later, Representative Peter King of New York introduced legislation in the House of Representatives that would provide immunity for individuals who reported suspicious activities concerning a threat to transportation systems. H.R. 1401, 110th Cong. (1st Sess. 2007). In introducing the bill, Representative King made specific reference to this action, stating:

> But what is absolutely disgraceful is to find out that lawyers are coming forward and advocacy groups are coming forward to represent those imams and suing, attempting to find the identity of those passengers, those citizens who acted in good faith, who responded to their government and reported what they deemed to be suspicious activity. . . . [T]hat is absolutely disgraceful. What this

11

> motion to recommit would do would be to provide immunity for any citizen, any individual that comes forward and reports suspicious activity in good faith.

153 Cong. Rec. H3099-03 (daily ed. Mar. 27, 2007) (statement of Rep. King).  Representative

Steve Pearce of New Mexico also commented:

> Sadly, a lawsuit has been filed in Minnesota which named as defendants the Americans who were simply trying to protect themselves and their country.  These everyday people have now found themselves subject to a lawsuit for simply reporting what they thought in good faith was suspicious activity.

Id. (statement of Rep. Pearce).

The totality of the discussion on the House floor regarding H.R. 1401 was directed toward providing immunity for individuals who reported suspicious activity.  See id.  Senators Jon Kyl, Susan Collins, and Joe Lieberman submitted a similar bill in the Senate, and the majority of the discussion there also concerned immunity for individuals who report suspicious activity to the appropriate officials.  See 153 Cong. Rec. S6018-01 (daily ed. May 11, 2007).  The lone exception was Senator Collins who discussed the responsibilities of officials who receive those reports:

> Once a report is received, those officials would be responsible for assessing its reasonableness and determining whether further action is required.  If these officials take reasonable action to mitigate the reported threat, they, too, would be protected from lawsuits.  Just as we should not discourage reporting suspicious incidents, we also should not discourage reasonable responses to them.

Id. (statement of Sen. Collins).  The remaining debate focused on the provisions of the bill applying to individual reporters of suspicious activity and made no reference to responders.  See 153 Cong. Rec. S10117-02; S10115-01 (daily ed. Jul. 26, 2007) (statement of Sen. Lieberman);

153 Cong. Rec. S10309 (daily ed. Jul. 20, 2007) (statement of Sen. Feingold).  In signing the

bill, President George W. Bush stated that he was "pleased that the legislation [he] signed today

protects Americans from being unduly prosecuted for reporting activity that could lead to acts of

terrorism."  Press Release, President George W. Bush, Implementing Recommendations of the

9/11 Commission Act of 2007 (Aug. 3, 2007) 2007 U.S.C.C.A.N. S5.  While Congress

specifically intended to create broad immunity for individuals who reported suspicious activities,

the legislative history provides little insight into whether it intended to modify the well

established immunity standard traditionally applicable to actions by law enforcement officials.

In determining to what extent § 1104 provides immunity to law enforcement officers,

"the 'long established plain language rule of statutory interpretation' requires 'examining the

text of the statute as a whole by considering its context, object, and policy." Am. Growers Ins.

Co. v. Fed. Crop Ins. Corp., 532 F.3d 797, 803 (8th Cir. 2008) (quoting Harmon Indus., Inc. v.

Browner, 191 F.3d 894, 899 (8th Cir. 1999)).  Agent Cannizzaro argues that § 1104 created a

lower standard for immunity than a traditional qualified immunity analysis, requiring merely a

showing that he took "reasonable action in good faith" in responding to the report of suspicious

activity.  Cannizzaro's Reply in Supp. of Mot. to Dismiss. [Docket No. 285] at 5.  Other than to

assert that his response was reasonable, he does not provide the Court with any guidance as to

what should be considered "reasonable action."  Plaintiffs argue that the Court should interpret §

1104 as providing a law enforcement officer with no greater immunity than that provided under

traditional qualified immunity principles.  Plaintiffs Mem. in Opp'n to Cannizzaro's Mot. to

Dismiss [Docket No. 265] at 30.

When interpreting a statute, "a court should consider the statute in light of judicial

13

concepts existing before it . . . was enacted." Estate of Wood v. C.I.R., 909 F.2d 1155, 1160 (8th Cir. 1990). Courts should consider that "Congress acts with knowledge of existing law, and that absent a clear manifestation of contrary intent, a newly-enacted or revised statute is presumed to be harmonious with existing law and its judicial construction." Id. (quotation omitted). Accordingly, for the Court to find that § 1104 displaces traditional qualified immunity there must be "some statutory or legislative indication that Congress so intended." Id. There is none.

The language of the statute indicates that Congress intended to apply traditional qualified immunity. First, the immunity provided by statute is referred to as "qualified immunity." 6 U.S.C. § 1104(b)(1). Second, the statute states that the "qualified immunity" is "consistent with applicable law in the relevant jurisdiction." Id. Third, the statute requires that the responding official take "reasonable action" in "good faith." Id. This language echoes the principles of traditional qualified immunity analysis. Saucier v. Katz, 533 U.S. 194, 202 (2001) ("The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."); Harlow v. Fitzgerald, 457 U.S. 800, 815 (1982) ("Qualified or 'good faith' immunity is an affirmative defense that must be pleaded by a defendant official."). Finally, the only non-statutory expression of legislative intent the court has found on this provision, Senator Collins' comment that if "officials take reasonable action to mitigate the reported threat, they, too, would be protected from lawsuits," also tracks the requirements of traditional qualified immunity. 153 Cong. Rec. S6018-01 (daily ed. May 11, 2007) (statement of Sen. Collins). The Court concludes that § 1104 codifies the traditional qualified immunity standard for law enforcement officers while extending its protections to parties who had not previously been

entitled to qualified immunity.  See 6 U.S.C. § 1104(d)(1)(A) & (B).[4]

### 3.      Unlawful Seizure

Plaintiffs allege that Cannizzaro lacked reasonable articulable suspicion when he requested that Officer Wingate detain Plaintiffs for questioning.  Alternatively, it is asserted that Cannizzaro lacked probable cause to arrest Plaintiffs in violation of Bivens v. Six Unknown Agents, 403 U.S. 388 (1971), depriving them of their individual rights under the Fourth Amendment to the Constitution to be free from unreasonable seizures.  3d Am. Compl. ¶ 158. Cannizzaro argues that he is entitled to qualified immunity on this Bivens claim.

The doctrine of qualified immunity protects government officials from "liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow, 457 U.S. at 818.  A court must determine whether the defendant violated a constitutional right and, if so, whether that right was clearly established.  Pearson v. Callahan, 129 S. Ct. 808, 816, 818 (2009).  To determine whether a particular right was clearly established, it must be viewed in a particularized, relevant sense: "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  Anderson v. Creighton, 483 U.S. 635, 639-40 (1987). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  Saucier, 533 U.S. at 202.  "Whether a given set of facts entitles the official to summary judgment on qualified immunity grounds is a question of law."  Greiner v. City of

_____

[4] Because the Court finds that § 1104 merely codifies the traditional qualified immunity analysis, Plaintiffs' argument that the statute is a violation of the separation of powers principles and an unlawful bill of attainder will not be addressed.

Champlin, 27 F.3d 1346, 1352 (8th Cir. 1994).  "Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that the defendant should have taken the disputed action."  Winters v. Adams, 254 F.3d 758, 766 (8th Cir. 2001) (quotations omitted).

### a.      Qualified Immunity: Violation of Constitutional Right

The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrant shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.  "In determining whether an encounter between a police officer and a citizen constitutes a Fourth Amendment detention or seizure, the crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business."  United States v. Barry, 394 F.3d 1070, 1074-75 (8th Cir. 2005) (quotations omitted); see also United States v. Mendenhall, 446 U.S. 544, 554 (1980) ("a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.").

For purposes of this Motion, Cannizzaro concedes that Plaintiffs were arrested.  See Cannizzaro's Mem. in Supp. of Mot. to Dismiss [Docket No. 229] at 10, n.2.  "Law enforcement officers are entitled to qualified immunity if they arrest a suspect under the mistaken belief that they have probable cause to do so–provided that the mistake is objectively reasonable."

16

Smithson v. Aldrich, 235 F.3d 1058, 1062 (8th Cir. 2000).  In other words, the required showing

"is not probable cause in fact but arguable probable cause."  Id. (quotations omitted).  An officer

has probable cause for an arrest "when the totality of the circumstances demonstrates that a

prudent person would believe that the arrestee has committed or was committing a crime."

Kuehl v. Burtis, 173 F.3d 646, 650 (8th Cir. 1999).  Additionally, "law enforcement officers

have a duty to conduct a reasonably thorough investigation prior to arresting a suspect, at least in

the absence of exigent circumstances and so long as law enforcement would not [be] unduly

hampered . . . if the agents . . . wait [] to obtain more facts before seeking to arrest."  Id.

(alterations in original).  Probable cause "does not exist when a minimal further investigation

would have exonerated the suspect."  Id. (internal quotations omitted).

       Based on the allegations in the Third Amended Complaint, the information available to

Cannizzaro and the MAC Defendants when Plaintiffs were arrested was that: (1) three of the

Plaintiffs observed the Muslim Maghreb prayer at the gate before boarding Flight 300; (2)

Shahin and Sadeddin requested seatbelt extensions; (3) Shahin left his seat to talk to Sadeddin;

and (4) Plaintiffs were Muslim clerics, possibly of Middle Eastern origin.  See 3d Am. Compl. ¶¶

27-63.[5]  Cannizzaro has not identified any crime, nor does the Court know of any crime, for

which these allegations create arguable probable cause.[6]  For this reason, the arrest of Plaintiffs

---

       [5] In his initial memorandum, Cannizzaro cites a number of "facts" to bolster his
contention that probable cause existed for the arrest.  Cannizzaro's Mem. in Supp. of Mot. to
Dismiss at 4, 12-13.  These additional facts are taken from the defamation claim Plaintiffs allege
against U.S. Airways and are not incorporated into the illegal seizure claim.  The Court may not
read the allegations in the Third Amended Complaint and infer that Cannizzaro was aware of, or
considered, these facts in determining whether to arrest Plaintiffs.

       [6] In their Motion for Summary Judgment, the MAC Defendants have posited three crimes
that the officers could have believed that Plaintiffs may have committed: (1) Aircraft Piracy

without probable cause, as alleged in the Third Amended Complaint, was a violation of Plaintiffs Fourth Amendment right to be free from unreasonable seizures.

### b.   Qualified Immunity: Whether Clearly Established

The right not to be arrested unless there is probable cause is clearly established.  See Goff v. Bise, 173 F.3d 1068, 1072 (8th Cir. 1999); see also Walker v. City of Pine Bluff, 414 F.3d 989, 992 (8th Cir. 2005); Habiger v. City of Fargo, 80 F.3d 289, 295 (8th Cir. 1996) cert. denied 519 U.S. 1011 (1996).  Plaintiffs allege that Ericksen and Wingate contacted Cannizzaro by phone, communicated to him the purported facts related to Plaintiffs' seizure by the MAC Defendants, and that Cannizzaro "requested or directed that the seizure continue."  3d Am. Compl. ¶ 64.  Plaintiffs also allege that through the concerted efforts of U.S. Airways, the MAC Defendants, and Cannizzaro, they "were placed under arrest."  Id. ¶ 66.  The allegations in the Third Amended Complaint assert that Cannizzaro participated in the arrest of Plaintiffs.  Arrest in the absence of probable cause was a clearly established constitutional violation.

Cannizzaro argues that regardless of whether the right not to be arrested absent probable cause is clearly established, he did not engage in the initial seizure but merely participated in a continuing seizure.  Cannizzaro's Mem. in Supp. of Mot. to Dismiss at 16-19.  He then argues that the law governing continuing seizures is not clearly established, and, thus, he is entitled to qualified immunity.  In expounding on his continuing seizure theory, Cannizzaro relies on

---

under 49 U.S.C. § 46502; (2) Interference with Flight Crew Members or Flight Attendants under 49 U.S.C. § 46504; and (3) Terroristic Threats under Minn. Stat. § 609.713.  See MAC Defendants' Mem. in Supp. of Summ. J. [Docket No. 235] at 19, n.7.  An examination of the elements of these statutes indicates that no reasonable officer could believe that there was probable cause to arrest Plaintiffs for a violation of any of these statutes based on the allegations in the Third Amended Complaint.

Wilson v. Spain, 209 F.3d 713, 715 (8th Cir. 2000), for the proposition that the period between

arrest and pretrial detention is "something of a legal twilight zone."  Wilson recognizes a circuit

split in how a claim should be analyzed when the use of excessive force by law enforcement

occurs "beyond the point at which an arrest ends and pretrial detention begins."  Id. (quotations

omitted).  In such situations, some courts apply a Fourth Amendment analysis while others use a

substantive due process analysis.  Id. n.2.  Because there is a circuit split on the issue,

Cannizzaro argues, the law is not clearly established.  See Winters, 254 F.3d at 766.

The facts of the instant case do not implicate the "continuing seizure" line of cases the

Eighth Circuit addressed in Wilson.  This case does not fall into "the legal twilight zone"

between arrest and pretrial detention, but rather the period between an initial Terry-type seizure

and an arrest.  The Fourth Amendment is the appropriate constitutional provision to use "when

evaluating questions of probable cause for arrest and detention."  Riley v. Dorton, 115 F.3d

1159, 1162 (4th Cir. 1997) (citing Gerstein v. Pugh, 420 U.S. 103 (1975)).  At its core, the

Fourth Amendment jurisprudence addresses "what constitutes an arrest," "what constitutes

probable cause to make an arrest," and identifies "at what point, short of an arrest, an individual

may have suffered a deprivation of personal freedom implicating the Fourth Amendment."  Id. at

1162-63 (citing cases).  Assuming Cannizzaro was involved in a "continuing seizure," the

continuing seizure occurred between the initial seizure (deplaning of Plaintiffs) and the arrest.

As Riley indicates, the law was clearly established that the Fourth Amendment would apply in

this situation and the "continuing seizure" theory cited by Cannizzaro, relying on Wilson, is

inapposite.

Cannizzaro next argues that a reasonable officer in his position could have concluded that

continuing the seizure for a few hours did not violate clearly established law.  Cannizzaro's

Mem. in Supp. of Mot. to Dismiss at 20.  In support, he cites Gerstein, which held that a

defendant detained without a warrant is entitled to a "prompt" probable cause hearing, and that a

prompt hearing must be held within 48 hours of the detention.  County of Riverside v.

McLaughlin, 500 U.S. 44, 56 (1991).  Cannizzaro misapplies the law concerning probable cause

hearings.  The jurisprudence surrounding a prompt probable cause hearing involves a suspect's

right to an appearance before a neutral magistrate.  Gerstein, 420 U.S at 113-18.  This body of

law has no application to the question of whether a law enforcement officer's arrest of a person

without probable cause was a violation of clearly established law.

At this procedural juncture, the Court concludes that the Third Amended Complaint

states sufficient allegations to conclude that Cannizzaro arrested Plaintiffs without probable

cause in violation of their right to be free of unreasonable seizures under the Fourth Amendment.

The right not to be arrested in the absence of probable cause is clearly established and, based on

the allegations in the Third Amended Complaint, no reasonable officer could have believed that

the arrest of Plaintiffs was proper.  Accordingly, Cannizzaro's claim of qualified immunity fails

and his Motion to Dismiss the Fourth Amendment illegal seizure claim is denied.

**4.      False Arrest**

Plaintiffs also allege false arrest by Cannizzaro in violation of Minnesota law.  3d Am.

Compl. ¶¶ 168-78.  Cannizzaro argues that because he is a federal official,[7] Plaintiffs' exclusive

remedy for false arrest is provided by the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§

---

[7] Cannizzaro raised his argument concerning dismissal due to the FTCA in his initial
memorandum.  Plaintiffs did not respond to the argument in their opposition brief.  Accordingly,
it is undisputed that Cannizzaro was acting within the scope of his employment.

1346(b)(1), 2671-80.  Cannizzaro argues that because Plaintiffs have not satisfied the requirements of the FTCA, the Court should dismiss the false arrest claim.  The FTCA is the "exclusive remedy for torts committed by federal employees acting within the scope of their employment."  Brown v. Armstrong, 949 F.2d 1007, 1013 (8th Cir. 1991); see also 28 U.S.C. § 2679(b)(1).[8]

The FTCA requires exhaustion of administrative remedies before a plaintiff may institute a claim under the statute.  It provides:

> An action shall not be instituted upon a claim against the United States for money damages for injury . . . caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing. . . .

28 U.S.C. § 2675(a).  The Supreme Court has consistently held that the "FTCA bars claimants from bringing suit in federal court until they have exhausted their administrative remedies." McNeil v. United States, 508 U.S. 106, 113 (1993).  Failure to do so properly results in dismissal.  Id.  Plaintiffs did not exhaust the appropriate administrative remedies before commencing this suit against Cannizzaro (or the appropriately substituted United States). Cannizzaro's Motion to Dismiss is, therefore, granted on the false arrest claim.

**B.     The MAC Defendants Motion for Summary Judgment**

**1.     The Summary Judgment Standard**

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall issue "if the

---

[8] In a FTCA claim, the employee is not a proper party and the Court would normally substitute the United States as the defendant rather than Cannizzaro in his official capacity. However, because this claim will not survive, the Court need not do so.

pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see Matsushita Elec.

Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  On a motion

for summary judgment, the Court views the evidence in the light most favorable to the

nonmoving party.  Ludwig, 54 F.3d at 470.  The nonmoving party may not "rest on mere

allegations or denials, but must demonstrate on the record the existence of specific facts which

create a genuine issue for trial."  Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

### 2. Unlawful Seizure

Plaintiffs assert a claim under 42 U.S.C. § 1983 alleging that the MAC Defendants

detained them without reasonable articulable suspicion or, in the alternative, that the MAC

Defendants arrested them without probable cause.  3d Am. Compl. ¶ 158.  The MAC Defendants

argue that they are entitled to immunity under both 6 U.S.C. § 1104 and traditional qualified

immunity.  As previously explained, see supra at III.A.2, the analysis under § 1104 for law

enforcement officers and the analysis for traditional qualified immunity are coterminous.  The

MAC Defendants must therefore demonstrate that either they did not violate a constitutional

right or, even if they did, that the right was not clearly established.

### a. Investigative Detention v. Arrest

Plaintiffs contend that the MAC Defendants lacked reasonable articulable suspicion to

justify their detention.  Plaintiffs' Mem. in Opp'n to Mot. for Summ. J. [Docket No. 267] at 36-

42.  Plaintiffs also allege that the MAC Defendants did not possess probable cause to arrest

them.  Id. at 43-53.  The MAC Defendants contend that they had reasonable articulable suspicion to detain Plaintiffs, that the detention never progressed beyond an investigative detention, and that even if under the totality of the circumstances a de facto arrest may have occurred, the MAC Defendants had arguable probable cause to effectuate the arrest.  For analytical purposes, the Court must determine, as a threshold matter, whether the encounter was merely an investigatory stop or if it rose to the level of an arrest.  In view of the totality of the circumstances, the Court concludes at some point in the five to six hour detention and interrogation period Plaintiffs were the subjects of an arrest.

A seizure, within the meaning of the Fourth Amendment, occurs when, "in the view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."  Mendenhall, 446 U.S. at 554.  Wingate testified directly that Plaintiffs were not free to leave, so there is no need to analyze what the circumstances may have led Plaintiffs to believe.  Wingate Dep. at 214.  As Plaintiffs were led from the plane, an investigatory detention began.  "[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop.  Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time."  United States v. Willis, 967 F.2d 1220, 1224 (8th Cir. 1992).  While there is no "bright line demarcation between investigative stops and arrests, a de facto arrest occurs when the officers' conduct is more intrusive than necessary for an investigatory stop."  United States v. Bloomfield, 40 F.3d 910, 916-17 (8th Cir. 1994) (quotation omitted).  Time is one factor for a court to consider in distinguishing between an investigatory stop and a de facto arrest, and a stop may become a de facto arrest "if it involves delay unnecessary to the legitimate investigation of

the law enforcement officers."  <u>Id.</u> at 917 (quotations omitted).  Courts are instructed to consider the degree of fear and humiliation that the police conduct engenders, whether a suspect has been transported to another location or isolated from others, whether a suspect was handcuffed, and whether he was confined in a police car.  <u>Id.</u>

The factors supporting a finding that Plaintiffs' detention by the MAC Defendants was a de facto arrest are: (1) Plaintiffs were removed from the airplane by the MAC Defendants (Wingate Dep. at 208); (2) the MAC Defendants arranged Plaintiffs in a line in the jetway about two feet apart, and at one point told them to face the wall with arms raised (<u>Id.</u> at 213-14); (Shqeirat Dep. at 99) (3) Plaintiffs were instructed not to talk to anyone (Hoerdt Dep. at 29); (4) the MAC Defendants asked Plaintiffs for their names and dates of birth (Edwards Dep. at 73); (5) some Plaintiffs were escorted back onto the plane in front of the other passengers to retrieve their carry-on luggage (Wingate Dep. at 217); (6) a canine unit checked the bags for explosives (<u>Id.</u> at 218-19); (7) Plaintiffs were placed in handcuffs (<u>Id.</u> at 224); (8) Plaintiffs were pat searched and their personal effects were removed and bagged by the officers (<u>Id.</u> at 236; Desubijana Dep. at 113; Hoerdt Dep. at 32-34; Shahin Dep. at 128-29; Sadeddin Dep. at 72-73); (9) Plaintiffs were detained on the jetway for one hour (Sadeddin Dep. at 73); (10) the MAC Defendants placed Plaintiffs in police cars in view of Flight 300 passengers and transported them to the police command center (Shahin Dep. at 130); and (11) once Plaintiffs arrived at the command center, they were separated and interrogated for approximately five hours (Edwards Dep. at 99; Wingate Dep. at 243-44; Shahin Dep. at 137; Shqeirat Dep. at 110).

While the exact point at which the investigatory stop evolved into a de facto arrest is fluid, the Court concludes that by the time Plaintiffs were placed in handcuffs, pat searched, had

their personal belongings removed and inventoried, and were transported in the police cruisers to the police command center, they were effectively arrested.  In response, the MAC Defendants argue that these factors, specifically the use of handcuffs, do not transform a seizure into an arrest.  MAC Defendants' Mem. in Supp. of Summ. J. at 22.  In support of this contention, the MAC Defendants cite a number of cases.  As a general rule the use of handcuffs does not, by itself, always rise to the level of an arrest, but the cases cited by the MAC Defendants are factually distinguishable from the instant case and, in fact, support the conclusion of a de facto arrest.

In Muehler v. Mena, 544 U.S. 93 (2005), the Supreme Court found that the use of handcuffs did not elevate an investigatory detention to an arrest.  The Court found that the use of handcuffs was reasonable "because the governmental interest outweigh[ed] the marginal intrusion."  Id. at 99.  The Court wrote that the "governmental interests in not only detaining, but using handcuffs, are at their maximum, when . . . a warrant authorizes a search for weapons and a wanted gang member resides on the premises."  Id. at 100.  This case is factually dissimilar.  First, the MAC Defendants were not executing a warrant issued by a neutral magistrate.  Second, there was no indication that Plaintiffs were armed.  Plaintiffs had cleared the security screening process, had their bags screened a second time by the canine unit, and had been subjected to a pat down search *before* they were placed in handcuffs.  Further, Plaintiffs were not in a home but in a restricted area of the airport.  Finally, unlike the situation in which officers enter the premises of a known gang member, the MAC Defendants had no particularized information that any of Plaintiffs were dangerous.

The MAC Defendants cite a Ninth Circuit case cautioning courts to "consider both the

inherent danger of the situation and the intrusiveness of the police action [such] that pointing a weapon at a suspect and handcuffing him, or ordering him to lie on the ground, or placing him in a police car will not *automatically* convert an investigatory stop into an arrest that requires probable cause."[9]  Washington v. Lambert, 98 F.3d 1181, 1186 (9th Cir. 1996).  In Washington, the plaintiffs were fully cooperative with the police.  Id. at 1184.  In spite of this cooperation, the officers ordered the plaintiffs out of their car, placed them in handcuffs, pointed guns at them, and put them in separate squad cars.  Id.  Both the district court and the Ninth Circuit found that these facts supported a determination that the plaintiffs had been arrested.  Id. at 1192.  Washington bolsters Plaintiffs' argument that their detention was a de facto arrest.

The final case[10] on which the MAC Defendants rely to support their contention that the use of handcuffs does not give rise to an arrest is United States v. Miller, 974 F.2d 953 (8th Cir. 1992).  Miller is an airport narcotics case in which the defendant was handcuffed while an officer went to retrieve the defendant's bag from the baggage carousel.  Id. at 956.  The officer had reasonable suspicion to detain the defendant based on suspicious behavior at the arrival gate.  Id.  The officer found cocaine in the bag, and Miller moved to suppress the drugs arguing that she had been unlawfully detained.  Id.  The court found that because the officers were outnumbered

---

[9] In their memorandum, the MAC Defendants conveniently omit the required consideration of the intrusiveness of the search in addition to the danger posed to law enforcement.  See MAC Defendants' Mem. in Supp. of Summ. J. at 22.  The entire quote and the resulting conclusion of an arrest having been made negates any support the MAC Defendants claim from Washington.

[10] The MAC Defendants also cite United States v. Thomas, 524 F.3d 855 (8th Cir. 2008), for the proposition that police are authorized to use handcuffs when making a Terry stop.  While Thomas does contain language to that effect, it contains no analysis of the use of handcuffs in a specific factual situation and is of little value in conducting the analysis in this case.

by suspects six to three, "handcuffing Miller was reasonable and was the least intrusive means available for [the officer] to safely maintain the status quo in order to achieve the purposes of the investigative detention." Id. at 957.

Miller is factually dissimilar to the instant case.  Unlike in Miller, there was no pressing concern here that Plaintiffs might leave the area.  Plaintiffs were within the secured zone of the airport not a baggage claim area outside the security perimeter as was the defendant in Miller. As Wingate testified, Plaintiffs were safely detained and not free to leave from the moment they were deplaned.  In addition, the concern for officer safety found in Miller was not present in this case, and the six suspects were cooperative on the jetway for an hour.  Also, the number of law enforcement agents on the jetway outnumbered Plaintiffs considerably.  At a minimum, the six MAC Defendants; Air Marshal Grewenow; Officers Dockter, Jacobsen, Moen, and Boser; and Cannizzaro and three other FBI agents were present prior to Plaintiffs' handcuffing and transport to the command center.  See Wingate Dep. at 173; Desubijana Dep. at 111; Hoerdt Dep. at 26; Schupp Aff., Ex. J (Cannizzaro Aff.) ¶ 4.  Unlike in Miller where the suspects outnumbered law enforcement by a ratio of two-to-one, the opposite appears true in this action with law enforcement outnumbering Plaintiffs fifteen to six.

In conclusion, the circumstances of Plaintiffs' encounter include telling indicia of an arrest.  They were placed in handcuffs, had their personal belongings confiscated, suffered a prolonged detention on the jetway without any additional, meaningful investigation by law enforcement, were transported by police car away from the plane in plain view of Flight 300's passengers, and experienced the extreme fear and humiliation of being falsely identified as dangerous terrorists.  See Bloomfield, 40 F.3d at 917 (enumerating various indicia of an arrest).

The MAC Defendants' conduct was more intrusive than necessary to effectuate an investigatory stop, and, accordingly, Plaintiffs experienced a de facto arrest. See id. at 916-17.

### b.   Qualified Immunity

The MAC Defendants are deprived of qualified immunity if they violated the right not to be arrested without arguable probable cause or, even if they did, that right was not clearly established. Pearson, 129 S. Ct. at 816, 818; Smithson, 235 F.3d at 1062. As discussed previously, the law is clearly established that an arrest without probable cause is a constitutional violation. See III.A.3.b; Goff, 173 F.3d at 1072. Therefore, the Court must decide only whether the MAC Defendants had arguable probable cause to arrest Plaintiffs. The Court must consider the MAC Defendants' conduct in light of the information they possessed at the time of the incident. Kuha v. City of Minnetonka, 365 F.3d 590, 601 (8th Cir. 2003). "Defendants will not be immune, however, if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that the defendant should have taken the disputed action." Id. at 602 (quotations omitted).

The MAC Defendants possessed the following information at the time Plaintiffs were arrested:

- There were six men of Middle Eastern descent;

- The men were praying loudly before the flight and chanting the word "Allah";

- The men talked about Saddam Hussein and cursed U.S. involvement in Iraq;[11]

---

[11] Plaintiffs have repeatedly denied they made any remark about Saddam Hussein or U.S. involvement in Iraq. See Shahin Dep. at 254; 3d Am. Compl. ¶ 38. Nevertheless, the Court must consider the information the MAC Defendants had at the time of their decision regardless of its veracity.

- Three of these men had one-way tickets and no checked luggage;[12]

- Most of the men requested seatbelt extensions;[13]

- A passenger was concerned about the praying and wrote a note to the pilot of Flight 300 to express that concern; and

- Plaintiffs took a "mysterious" seating arrangement on the plane.[14]

Wingate Dep. at 155-56, 173-80. This information, if it were all true, falls short of leading a reasonable officer to conclude there was probable cause that a crime was being or had been committed. No officer has stated that he evaluated the factors and made a probable cause determination—arguable, or otherwise. Officer Wingate agrees he made no probable cause determination. When asked if he had probable cause an individual had committed a crime, Wingate testified that he "did not make that determination." Wingate Dep. at 200.

Assuming, after weighing the above factors, the MAC Defendants believed there might be evidence approaching probable cause, their next action should have been to check the veracity of this information. Under a relaxed standard of arguable probable cause, a cursory investigation by the officers would have cast further doubt about many of the "facts" raising suspicion. See Kuehl, 173 F.3d at 650 (holding that law enforcement is required to conduct a reasonably thorough investigation prior to arresting a suspect).

The initial call from U.S. Airways to police dispatch requesting assistance in removing Plaintiffs from Flight 300 included the information that the three Plaintiffs with one-way tickets

---

[12] This fact has been proven false. These Plaintiffs did not have one-way tickets but were re-booked by U.S. Airways.

[13] It is now uncontested that only Shahin and Saddedin requested seatbelt extensions.

[14] The record reflects Plaintiffs sat in the seats assigned by U.S. Airways.

did not purchase those tickets as one-way tickets, but rather the tickets were issued by U.S. Airways as "re-booked" tickets on a return flight to Phoenix. <u>See</u> Schupp Aff., Ex. E (dispatch tape). Even if this fact was not directly communicated to the MAC Defendants, a simple review of the passenger manifest available at the passenger check-in station at Gate C-9 during the course of the hour-long detention on the jetway would have revealed the three Plaintiffs did not purchase one-way tickets. Mohammedi Aff. Ex. 23 (Winn Report) at 2-3. The manifest would also have shown that Plaintiffs did not devise a "mysterious" seating arrangement but were assigned their seats by U.S. Airways. <u>Id.</u> Asking Plaintiffs about the reason for their visit to Minneapolis would likely have informed the officers about the three-day NAIF conference, which would help explain why the six imams were together and the lack of checked baggage.

Additionally, Wingate interviewed a flight attendant who told him that only two Plaintiffs requested seatbelt extensions. Wingate Dep. at 223; Schupp Aff., Ex. F (Wingate police report). The 6'1", 285-pound Shahin requested one extension, and the 5'11", 250-pound Sadeddin requested the other. Shahin Dep. 109-11; Sadeddin Aff. ¶ 8; Sadeddin Dep. 63-65. The MAC Defendants have produced no evidence of a documented instance in which seatbelt extensions were used as a weapon or that law enforcement ever expressed concern about their use as a weapon. It is difficult to understand what danger a seatbelt extension poses that is not also posed by a sturdy belt with a large buckle. Even assuming the extensions could be employed as a weapon, the MAC Defendants have failed to offer a reasoned explanation of how Sadeddin, who is completely blind, could pose such a threat. Finally, the MAC Defendants had no information that they should be on the look-out for suspicious activity involving Muslims on the date of the incident and never contacted TSA to determine if Plaintiffs were identified as

heightened security risks.  Wingate Dep. at 126-28, 221.

After only a cursory, routine investigation, several of these concerns would have been eliminated leaving no basis for probable cause based on the remaining information.  Praying in public, commenting on current events, and even criticizing governmental policy is protected speech under the First Amendment.  Plaintiffs' Middle Eastern descent does not change the analysis.  Similar behavior by Russian Orthodox priests or Franciscan monks would likely not have elicited this response.  The probable cause analysis does not change merely because Plaintiffs were part of a group.  The MAC Defendants cite United States v. Wai-Keung for the proposition that officers may base probable cause on the actions of a group.  115 F.3d 874 (11th Cir. 1997).  In Wai-Keung, officers had probable cause that a specific person in the group had committed a crime.  Id. at 876.  The Court found that because probable cause existed for one member of a group, it could extend to all members of the group.  Id.  In contrast, in the instant case there was no probable cause that any individual Plaintiff had committed a crime.  Accordingly, there was no arguable probable cause to arrest Plaintiffs, and the MAC Defendants violated Plaintiffs clearly established constitutional right against an illegal seizure.

The MAC Defendants' next argument is that they merely followed an FBI request and no reasonable officer would have known that following a superior law enforcement agency's request was unlawful.  MAC Defendants' Mem. in Supp. of Summ. J. at 16-18.  The record, however, belies this contention.  Wingate describes the jurisdictional relationship between the MAC police department and the FBI as one of "joint jurisdiction."  Wingate Dep. at 189.  The MAC Defendants also testified that they knew they should not honor requests that are not legally justified.  Id. at 88; Goetz Aff., Ex. L (Airport Police Department Rules and Regulation) 1.03,

subd. 2 ("Department members will not obey any order which they have reason to believe would cause them to commit an illegal act. . . .").

Even if the Court were to accept that the FBI is a superior law enforcement agency,[15] the case law does not support the MAC Defendants' contention for immunity.  In <u>Anthony v. City of New York</u>, the court granted summary judgment in favor of the defendants based on qualified immunity.  339 F.3d 129 (2d Cir. 2003).  In that case, officers who were responding to a 911 call made by a female from an apartment discovered a distraught woman with Down Syndrome.  The responding officers seized the woman and removed her to a hospital based on the order of a superior officer.  <u>Id.</u> at 138.  The court applied the rule that "[p]lausible instructions from a superior or fellow officer support qualified immunity where, viewed objectively in light of the surrounding circumstances, they could lead a reasonable officer to conclude that the necessary legal justification for his actions exists."  <u>Id.</u> (quotations omitted).  The court found that the seizure order was apparently valid in light of the 911 call in which the caller expressed the desire to harm herself and all of the surrounding circumstances available to the officers at the time.  <u>Id.</u>  The <u>Anthony</u> court emphasized that qualified immunity requires more than a simple order from a superior officer, rather there must be a legal justification for the action.  An arrest without probable cause lacks such a legal justification.  Expressed in another way, an order from a

_____

[15] The MAC Defendants' argument is premised on 28 C.F.R. § 0.85(l) which provides that the Director of the FBI shall "[e]xercise Lead Agency responsibility in investigating all crimes for which it has primary or concurrent jurisdiction and which involve terrorist activities or acts in preparation of terrorist activities. . . ."  The regulation defines terrorism as "the unlawful use of force and violence against persons or property to intimidate or coerce a government, the civilian population, or any segment thereof, in furtherance of political or social objectives.  <u>Id.</u>  On the record before the Court and based on the testimony of the officers, there was no belief by any MAC Defendant that Plaintiffs were engaged in an act of terrorism that would trigger FBI jurisdiction under 28 C.F.R. § 0.85(l).

superior officer can be a factor in the qualified immunity analysis, but an officer cannot wholly abdicate his or her independent responsibility for making a determination of the legality of a seizure by relying exclusively on a superior's order.

The other case primarily relied upon by the MAC Defendants is Liu v. Phillips.  234 F.3d 55 (1st Cir. 2000).  In Liu, the court granted qualified immunity to a local police officer who arrested the plaintiff based on the order of an INS agent who wrongfully told the officer that the plaintiff was in violation of immigration law.  Id. at 56.  The court recognized that the officer was largely ignorant about immigration law, immigration laws are rarely enforced by local police officers, and immunity for such an officer should apply when "the agent who directs or authorizes the arrest has made a mistake of law equally invisible to the assisting officer."  Id. at 57, 58.  Liu is distinguishable from this case.  First, Wingate testified that the FBI did not instruct him to arrest Plaintiffs.  Wingate Dep. at 206.  Second, the relevant law surrounding probable cause is not unknown to the MAC Defendants but rather known to them and clearly established.  Third, unlike the local police officer who has little experience applying immigration law, airport police should be well educated on both the probable cause standard and elements of any crimes for which behavior at an airport might create such probable cause.  Accordingly, even considering the MAC Defendants' contention that they were only following the orders of a superior law enforcement agency, no reasonable officer could have obeyed an order to arrest Plaintiffs in the absence of probable cause.

Finally, the MAC Defendants suggest that the attacks of September 11, 2001—perpetrated by men of Middle Eastern descent who espoused a radical version of Islam—justifies a massive curtailment of liberty whenever terrorism, and in this case, the

suspicion of Islamic terrorism, is concerned.  Unquestionably the events of 9/11 changed the

calculus in the balance American society chooses to make, especially in airport settings, between

liberty and security.  Ultimately, the proper balance will be achieved, in large part, because we

have the most capable and diligent law enforcement and intelligence communities in the world.

But when a law enforcement officer exercises the power of the Sovereign over its citizens, she or

he has a responsibility to operate within the bounds of the Constitution and cannot raise the

specter of 9/11 as an absolute exception to that responsibility.  On the record before the Court,

no reasonable officer could have believed they could arrest Plaintiffs without probable cause.

The right that was violated is clearly established, and, thus, the MAC Defendants are not entitled

to qualified immunity.  Accordingly, summary judgment is denied on the unreasonable seizure

claim.

### 3.      False Arrest

"[U]nder Minnesota law, a public official is entitled to official immunity from state law

claims when that official is charged by law with duties that require the exercise of judgment or

discretion.  Generally, police officers are classified as discretionary officers entitled to that

immunity."  Johnson v. Morris, 453 N.W.2d 31, 41-42 (Minn. 1990) (citation omitted); see

Maras v. Brainerd, 502 N.W.2d 69, 77 (Minn. Ct. App. 1993).  However, conduct is not immune

from liability if the public official "is guilty of a wilful or malicious wrong."  Rico v. State, 472

N.W.2d 100, 107 (Minn. 1991).  "Malice is 'the intentional doing of a wrongful act without legal

justification or excuse, or, otherwise stated, the willful violation of a known right.'"  Samuelson

v. City of New Ulm, 455 F.3d 871, 878 (8th Cir. 2006) (quoting Carnes v. St. Paul Union

Stockyards Co., 205 N.W. 630, 631 (Minn. 1925)).  The "willful or malicious wrong" exception

to official immunity "anticipates liability only when an official intentionally commits an act that he or she has reason to believe is prohibited."  Johnson v. County of Dakota, 510 N.W.2d 237, 240-41 (Minn. Ct. App. 1994) (quoting Rico, 472 N.W.2d at 107).

The tort of false arrest is established when there is (1) an arrest by the defendant and (2) that arrest is unlawful.  Lundeen v. Renteria, 224 N.W.2d 132, 135 (Minn. 1974).  Plaintiffs were arrested by the MAC Defendants.  See III.B.2.a.  An arrest without probable cause is unlawful. See Lundeen, 224 N.W.2d at 136; see also Adewale v. Whalen, 21 F. Supp. 2d 1006, 1016 (D. Minn. 1998).  The MAC Defendants did not have arguable probable cause for the arrest.  See III.B.2.  Thus, the MAC Defendants are not entitled to official immunity and summary judgment on the false arrest claim is denied.[16]

### 4.      Equal Protection

Plaintiffs allege that by improperly denying them access to Flight 300 and arresting them, the MAC Defendants intentionally discriminated against them based on their race, religion, color, or national origin in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.  3d Am. Compl. ¶¶ 148-49.  The Equal Protection Clause "prohibits selective enforcement of the law based . . . on race."  Whren v. United States, 517 U.S. 806, 813 (1996).  A plaintiff asserting a § 1983 action of selective enforcement of the law based on Equal Protection must demonstrate both a discriminatory purpose and a discriminatory effect.  United States v. Bell, 86 F.3d 820, 823 (8th Cir. 1996).  "To show discriminatory purpose, the claimant must show the official's decision to enforce the law was at

---

[16] In the alternative, to the extent 6 U.S.C. § 1104 can be read to preempt state official immunity, the MAC Defendants are not entitled to immunity under this statute for the reasons set forth above.  See III.B.2.b

least partially based on race." Id.  A plaintiff must also prove that similarly situated individuals were not arrested to show discriminatory effect.  Johnson v. Crooks, 326 F.3d 995, 1000 (8th Cir. 2003).

Plaintiffs have presented evidence that could lead a reasonable jury to conclude that they were arrested at least partly on the basis of their race, religion, or national origin.  Among the factors Wingate considered in initiating the detention of Plaintiffs that resulted in the arrest were Plaintiffs' Middle Eastern ethnicity and the fact that they prayed in an "Arabic" dialect and chanted the words "Allah, Allah, Allah." Wingate Dep. at 195.  Accordingly, the discriminatory purpose requirement is met.

In considering discriminatory effect, the Court will determine whether Plaintiffs were treated differently than other passengers who have been denied service.  Both officers Wingate and Desubijana testified that not every deplaning results in a detention or an arrest.  Wingate Dep. at 135; Desubijana Dep. at 79-80.  A review of Airport Police Department incident reports involving other passengers who have been identified as suspicious and denied service demonstrates that these incidents did not always result in the arrest of the passenger.  See Goetz Aff. Ex. M.  A reasonable jury could conclude that Plaintiffs were treated differently than similarly situated passengers who were denied service.

In conclusion, the MAC Defendants are not entitled to qualified immunity on the unreasonable seizure claim and are not entitled to official immunity on the false arrest claim. Plaintiffs have presented evidence that a reasonable jury could conclude that the MAC Defendants violated the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.  The MAC Defendants' Motion for Summary Judgment is denied.  These are

matters better decided by a fact finder given the many factual disputes in the record.

**C.     U.S. Airways's Motion for Summary Judgment**

Plaintiffs assert a claim under 42 U.S.C. § 1983 alleging that U.S. Airways violated the Fourth and Fourteenth Amendments to the United States Constitution by acting in concert with the MAC Defendants.  U.S. Airways is also a defendant in Plaintiffs' false arrest claim.

**1.     Unlawful Seizure**

As a threshold matter, the parties disagree on the test the Court should apply to determine whether a private entity acts "under color of state law" for purposes of § 1983 when calling the police for assistance.  U.S. Airways argues for the test as applied in the Third and Fifth Circuits– a private entity acts under color of law only when "(1) the police have a pre-arranged plan with the [private entity], and (2) under the plan, the police will arrest anyone identified [by the private entity] without independently evaluating the presence of probable cause." Cruz v. Donnelly, 727 F.2d 79, 81 (3d Cir. 1984) (citing Hernandez v. Schwegmann Bros., 673 F.2d 771 (5th Cir. 1982)).  The Eighth Circuit has not explicitly adopted this test.  Instead, it has found § 1983 liability when the police action, made in concert with a private entity, is "tantamount to substituting the judgment of a private party for that of the police or allowing the private party to exercise state power." Young v. Harrison, 284 F.3d 863, 870 (8th Cir. 2002).  The tests are similar, but the Court will apply the test our circuit, the Eighth, formulated.

Plaintiffs argue that "[t]here was a mutual understanding between U.S. Airways and MAC to deplane and arrest Plaintiffs because the MAC officers received instruction from U.S. Airway's employees."  Mem. in Opp'n to Summ J. [Docket No. 264] at 18.  In denying U.S. Airways's Motion to Dismiss [Docket No. 13], the Court found that the allegations in the First

Amended Complaint were sufficient to state a claim under § 1983 that MAC and U.S. Airways acted in concert.  Specifically, the Court relied on the statement that "Shqeirat asked the [MAC] police officer what was going on to which the officer replied: 'I do not know.  This is the airline's call and not our call,' 1st Am. Compl. [Docket No. 5]."  November 20, 2007 Mem. Op. and Order [Docket No. 97] at 22.  The deposition testimony of the officers taken in discovery clarifies the meaning of that statement.  Desubijana testified that when asked what was going on, he told one of the Plaintiffs they "had been denied boarding by U.S. Airways–or America West and that–and that [the MAC Defendants] were just there to assist."  Desubijana Dep. at 108.  The testimony makes clear that the comment, "[t]his is the airline's call and not our call," referred to the decision to deplane Plaintiffs, not to arrest them, and does not support a finding of a mutual understanding or concert of action between MAC and U.S. Airways.

The law enforcement officers did not substitute the judgment of U.S. Airways for their own.  Officer Wingate testified that because there can be a discrepancy between the facts of a situation as they are relayed to him by dispatch and the facts of the actual situation, his first action upon arriving at the scene was to interview Davis, a U.S. Airways employee.  Wingate Dep. at 149-51.  He took information from Davis, including the information about the passenger note, and consulted with Desubijana and Grewenow.  Id. at 173.  The officers next interviewed the passenger who wrote the note.  Id.  Based on the comments of the passenger, Wingate and Grewenow decided that the behavior was suspicious and again consulted with Desubijana, Karsnia, and Ericksen.  Id. at 187-88.  No one from U.S. Airways participated in the group consultation.  Id. at 188.  The officers decided to inform the FBI about their suspicions, and the FBI requested that Plaintiffs be detained for more questioning.  Id. at 206.  The testimony

unequivocally is that the determination that Plaintiffs' behavior was suspicious and the decision to arrest Plaintiffs resulted from an independent (albeit cursory) investigation by law enforcement officers, and was not directed by U.S. Airways.  The four officers who have been deposed have all testified that no personnel from U.S. Airways directed or requested that Plaintiffs be detained or arrested.  Id. at 245; Desubijana Dep. at 133-34; Edwards Dep. at 110-11; Hoerdt Dep. at 57.[17]

Lastly, Plaintiffs argue a mutual understanding between U.S. Airways and MAC to detain and arrest them can be inferred because MAC officers do not usually participate in the deplaning of passengers.  In the initial call U.S. Airways placed to airport security, Penny Breedlove stated "We're going to be pulling off six Arabic passengers" and the operator's response was, "So do you want an officer down there while you pull these people off; is that what you are saying?" Schupp Aff. Ex. E (emphasis added).  This exchange is strong evidence that U.S. Airways did not instruct the officers to deplane Plaintiffs, rather they made the determination to deplane Plaintiffs prior to calling the police.  Additionally, although one U.S. Airways employee, Danielle Manning, suggested that Plaintiffs had not met the requirements for denying them service, see Mohammedi Aff. Ex. 25, the pilot, Captain Wood, overrode Manning's suggestion and has stated that he made the decision to deny transportation to Plaintiffs.  Wood Decl. [Docket No. 253] ¶ 9.  Furthermore, while Wingate testified that officers need not be present

---

[17] Plaintiffs cite a report written by Davis in which he states that he and Penny Breedlove were present on the jetway at the same time as Plaintiffs, as evidence that U.S. Airways directed the officers to detain and arrest Plaintiffs.  See Mohammedi Aff. Ex. 12.  Davis and Breedlove's involvement was limited to taking the passenger names given to her by the officers and having their checked baggage removed from the flight.  Id.  This evidence does not support an inference that U.S. Airways directed, encouraged, or participated in Plaintiffs' arrest.

every time an airline decides to deny service to a passenger, he also testified that officers are usually present as a precautionary measure in case a passenger becomes disruptive.  Wingate Dep. at 132-35.  The fact that the MAC Defendants actually boarded the plane to escort Plaintiffs off the plane rather than U.S. Airways asking them to exit the plane, does not create an inference of a mutual understanding.  Given that six passengers were being denied service, it was reasonable for officers to take the lead because of the potential danger if several removed passengers were to become disruptive.  A law enforcement decision had been made at this time that there was reasonable suspicion to stop and question Plaintiffs, and the jetway was a better place to do this than on board the aircraft.  If any inference of mutual understanding can be drawn from MAC's participation, that inference is destroyed by Captain Wood's affidavit and the sworn testimony of the four officers that U.S. Airways did not direct the officers to deplane or arrest Plaintiffs.  Plaintiffs' arguments to the contrary do not create a genuine issue of material fact.  For these reasons, U.S. Airways is granted summary judgment on Plaintiffs' § 1983 claims for unlawful seizure.

### 2. Section 1983 Denial of Transportation

Plaintiffs allege that U.S. Airways' denial of transportation is a § 1983 violation of the Fourteenth Amendment's Equal Protection Clause.  Courts require that before § 1983 liability can be attributed to a private entity, "the conduct allegedly causing the deprivation of a federal right [must] be fairly attributable to the State."  Lugar v. Edmondson Oil Co., 457 U.S. 922, 937 (1982).  Analysis of these claims employs the "fair attribution" test:

> First, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state or by a person for whom the State is responsible. . . . Second, the party charged with the deprivation must be a person who may

40

fairly be said to be a state actor.

Id. (internal citations omitted).  For purposes of this Motion, U.S. Airways concedes that

whether 49 U.S.C. § 44902(b)[18] satisfies the first requirement of the "fair attribution" test raises a

fact issue.  Regardless of that fact determination, U.S. Airways argues its "decision to deny

Plaintiffs transportation cannot be 'ascribed to any governmental decision,'" and, therefore,

Plaintiffs will not be able to satisfy the second requirement.  U.S. Airways' Mem. in Supp. of

Summ. J. [Docket No. 242] at 20 (quoting Lugar, 457 U.S. at 937-38).

The decision to deny Plaintiffs transportation by removing them from the plane was made

before U.S. Airways contacted any government official or "state actor."  The initial call from

U.S. Airways to the airport police demonstrates U.S. Airways had already made the decision,

Schupp Aff. Ex. E ("We're going to be pulling off six Arabic passengers"), and Hoerdt testified

that U.S. Airways "had already decided that the passengers were not going to fly on [Flight

300]."  Hoerdt Dep. at 24.  Captain Wood has averred he made the decision to remove Plaintiffs

from the plane prior to any government actors being contacted.  Wood Aff. ¶ 11.  Additionally,

there is no evidence that U.S. Airways' decision to refuse to fly Plaintiffs on the following day

was made based on any government intervention.  Plaintiffs were denied transportation by U.S.

Airways even after the government was persuaded that Plaintiffs posed no threat.  See Faja Aff.

[Docket No. 246] ¶¶ 35-39; Shahin Aff. [Docket No. 245] ¶¶ 30-34; Shqeirat Aff. [Docket No.

247] ¶¶ 35-37; Sadeddin Aff. ¶¶ 22-25.

Plaintiffs do not dispute this evidence but instead argue that U.S. Airways' actions can be

---

[18] Section 44902 provides that "[s]ubject to the regulations of the Under Secretary [of Transportation for Security], an air carrier . . . may refuse to transport a passenger or property the carrier decides is, or might be, inimical to safety."

fairly attributed to the state because at the time of the incident (1) its security policies were heavily regulated by the state and (2) it regularly received financial and administrative aid from the government.  Plaintiffs' Mem. in Opp'n to Summ J. at 13-17.  Government regulation by itself is not enough to transform the actions of a private entity into state action, but when the state "has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the state," courts should find a close nexus between a regulated entity and the state sufficient to find a private entity a state actor.  American Mfgs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 52 (1999).  Plaintiffs argue that the close nexus exists here because U.S. Airways adopted, almost verbatim, state drafted model security policies.  American Manufacturers forecloses this argument.  In that case, the Court held that "actions taken by private entities with the mere approval or acquiescence of the State is not state action."  Id.  Plaintiffs have adduced no evidence that the state directed U.S. Airways to adopt the model policies.  They merely assert a conclusory statement that drafting such policies created "significant encouragement" for U.S. Airways to carry out the state's desires.  Plaintiffs' Mem. in Opp'n to Summ J. at 14-15.  No precedent has been presented that voluntary adoption of governmental policies creates a close nexus for attributing state action to a private entity.

Plaintiffs next argue that U.S. Airways is a state actor because of the Government's financial and administrative involvement in its operations.  The Government has provided U.S. Airways, along with the entire airline industry, substantial aid.  See Mohammedi Aff. Exs. 20-22.  This aid does not transform U.S. Airways into a state actor.  Plaintiffs cite Lebron v. National R.R. Passenger Corp., 513 U.S. 374 (1995), to support their position, but that case is inapposite.  While the Court in Lebron found that Amtrak was a state actor, it based its analysis

not on the governmental aid Amtrak received but on the findings that (1) Amtrak was a corporation created by special law (2) for the furtherance of government objectives and (3) the government retained permanent authority to appoint a majority of its directors.  Id. at 400.  In contrast to Plaintiffs' argument, other courts have found that even significant government funding is not enough to convert a private entity into a state actor.  See Nichols v. Metro. Ctr. for Indep. Living, Inc., 50 F.3d 514, 518 (8th Cir. 1995) (finding that even though the private entity "depends upon the government for nearly all its funding, . . . performs uniquely public functions, . . . [and] is subject to extensive governmental regulation and licensing," it was not a state actor); see also Rendell-Baker v. Kohn, 457 U.S. 830, 840 (1982).  Instead, Plaintiffs must show direct governmental control with either the organization or the conduct that caused the alleged deprivation of Plaintiffs' rights.  Nichols, 50 F.3d at 518.  Plaintiffs can show no such control.

The final case Plaintiffs rely on is a race discrimination case often discussed in Constitutional Law classes.  In Burton v. Wilmington Parking Authority, 365 U.S. 715 (1961), the Court found that a private restaurant located in a state parking garage was a state actor guilty of violating the Equal Protection Clause of the Fourteenth Amendment.  The restaurant itself was a private entity, but the building and land were publicly owned, had been dedicated for public use by a city ordinance, and the city covered many of the costs of maintenance and upkeep.  Id. at 723-24.  There was evidence the city would also suffer financial injury if the restaurant were integrated.  Id. at 724.  The instant action is no Burton.  A private entity merely receiving public funds is far different than a private entity created and financed by public funds, operating inside public property, and, most importantly, engaging in constitutional violations that also financially benefit the state.

43

In conclusion, U.S. Airways is not a state actor for purposes of the § 1983 denial of transportation claim.  Having its security policies regulated by the state and regularly receiving financial and administrative aid from the government does not render U.S. Airways a state actor.

### 3.      False Arrest

A private party "is not liable for false imprisonment for conveying information about suspected criminal activity unless that party directly persuades or commands the police to detain the suspect."  Smits v. Wal-Mart Stores, Inc., 525 N.W.2d 554, 558 (Minn. Ct. App. 1994) (citing Restatement (Second) of Torts § 45A cmt. c (1965)).  "Unless a person's conduct rises to the level of instructing the police to arrest a person, no liability can be imposed."  Id. (citing Restatement (Second) of Torts § 45A cmt. c (1965)); Ward v. National Car Rental Sys., 290 N.W.2d 441, 442 (Minn. 1980).  There is no evidence U.S. Airways instructed the officers to arrest Plaintiffs, and the decision to detain and arrest Plaintiffs was made by law enforcement alone.  See Wingate Dep. at 245; Desubijana Dep. at 133-34; Edwards Dep. at 110-11; Hoerdt Dep. at 57.  Accordingly, U.S. Airways is entitled to Summary Judgment on the False Arrest claim.[19]

### D.      Plaintiffs' Second Motion for Relief Per Rule 56(f)

Plaintiffs argue that the Court should deny U.S. Airways' Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56(f).  The Eighth Circuit has ruled that Rule 56 "does not require trial courts to allow parties to conduct discovery before entering summary judgment."  Humphreys v. Roche Biomed. Labs., Inc., 990 F.2d 1078, 1081 (8th Cir. 1993).

---

[19] Whether U.S. Airways is immune from suit under 6 U.S.C. § 1104 and whether the statute is an unlawful Bill of Attainder are issues that need not be addressed because of the grant of summary judgment on other grounds.

Instead, a party invoking Rule 56(f)'s protection must "affirmatively demonstrat[e] why he cannot respond to a movant's affidavits . . . and how postponement of a ruling on the motion will enable him, by discovery or other means, to rebut the movant's showing of the absence of a genuine issue of fact."  <u>Willmar Poultry Co. v. Morton-Norwich Prods., Inc.</u>, 520 F.2d 289, 297 (8th Cir. 1975).

Plaintiffs contend that important documents and depositions are still pending, including depositions of Captain Wood, Davis, and Manning.  The Court is not persuaded that the depositions of these individuals would produce evidence that would create a fact question to preclude summary judgment on the issues of unlawful seizure, denial of transportation, and false arrest.  These witnesses may have relevant information on Plaintiffs' remaining claims, but there is no indication that they will testify that U.S. Airways ordered, requested, or directed that Plaintiffs be arrested.  To testify in such a manner would be contrary to their own prior statements and the testimony of at least four law enforcement officers.  Additionally, Plaintiffs have had over a year to conduct discovery and take the necessary depositions but have failed to do so.

Finally, Plaintiffs argue that U.S. Airways' Motion should be denied pursuant to Rule 56(f) because several pertinent sensitive security information ("SSI") documents have not been disclosed.  They contend that U.S. Airways uses the fact that it followed protocol, and then hides behind SSI as the reason it cannot disclose all of the documents creating that protocol, as both a sword and a shield.  Courts have recognized that parties may not use confidentiality restrictions as both a sword and a shield, but this restriction applies primarily in the attorney-client privilege or attorney work product context.  <u>See</u>  <u>United States v. Workman</u>, 138 F.3d 1261 (8th Cir.

45

1998) (attorney-client privilege); <u>Grace United Methodist Church v. City of Cheyenne</u>, 451 F.3d

643 (10th Cir. 2006) (work product); <u>Weiss v. National Westminster Bank, PLC</u>, 242 F.R.D. 33

(E.D.N.Y. 2007) (work product); <u>Strauss v. Credit Lyonnais, S.A.</u>, 242 F.R.D. 199 (E.D.N.Y.

2007) (work product); <u>Medtronic, Inc. v. Guidant Corp.</u>, 378 F. Supp. 2d 503, n.2 (D. Del. 2005)

(attorney-client privilege).  No court has extended the sword and shield doctrine to the realm of

SSI, and this Court will not do so either.  Moreover, Plaintiffs have not proffered how that

evidence would effect the state actor analysis of the issues before the Court in this Motion.

Accordingly, Plaintiffs' Second Motion for Relief Per Rule 56(f) is denied.

# IV. CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED** that:

1.    Defendant Michael N. Cannizzaro's Motion to Dismiss [Docket No. 230] is

    **GRANTED IN PART** and **DENIED IN PART**;

2.    Defendants Bradley Wingate, Roby Desubijana, Matthew Edwards, Sean Hoerdt,

    Jason Ericksen, and David Karsnia's (the "MAC Defendants") Motion for

    Summary Judgment [Docket No. 233] is **DENIED**;

3.    Defendants U.S. Airways Group, Inc. and U.S. Airways, Inc.'s Motion for

    Summary Judgment [Docket No. 240] is **GRANTED**; and

4.    Plaintiffs Ahmed Shqeirat, Mohamed Ibrahim, Didmar Faja, Omar Shahin,

    Mahmoud Sulaiman, and Marwan Sadeddin's Second Motion for Relief Per Rule

    56(f) [Docket No. 273] is **DENIED**.

BY THE COURT:

s/Ann D. Montgomery

_____

ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated: July 24, 2009